**SECURITIES and EXCHANGE COMMISSION, Plaintiff,**

v.

**Todd M. FICETO, et al., Defendants.**

**Case No. CV 11–1637–GHK (RZx).**

United States District Court,
C.D. California.

Dec. 20, 2011.

Donald W. Searles, Lucee S. Kirka, Securities and Exchange Commission, Los Angeles, CA, for Plaintiff.

Thomas V. Reichert, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, PC, Marc S. Harris, Los Angeles, CA, for Defendants.

## MEMORANDUM AND ORDER

GEORGE H. KING, District Judge.

This matter is before us on Defendants Todd M. Ficeto, Hunter World Markets, Inc., and Hunter Advisors, LLC's Motion to Dismiss First Amended Complaint ("Motion"), and Defendant Colin Heatherington's Joinder in the Motion ("Joinder"). We have considered the papers filed in support of and in opposition to this Motion, and deem this matter appropriate for resolution without oral argument. L.R. 7–15. Accordingly, we rule as follows.

## I. Background

For purposes of this Motion, we accept the allegations of the First Amended Com-

plaint ("FAC") as true and construe them in the light most favorable to the Plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.2009). As such, we describe the Parties and alleged market manipulation scheme based on the allegations set forth in the FAC. We need not accept as true, however, legal conclusions "cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

### A. Parties [1]

On February 24, 2011, Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC") filed this securities action. Described in general terms, Plaintiff alleges that Defendants engaged in a fraudulent scheme to manipulate the prices of thinly traded U.S. microcap stocks on the domestic over-the-counter securities market, and to "pump" the portfolio values of offshore hedge funds. Plaintiff named six defendants in the action, all of whom allegedly participated in and benefitted from the alleged scheme.

Defendant Hunter World Markets, Inc. ("HWM") was an SEC-registered broker-dealer located in Beverly Hills, California that allegedly conducted the transactions at issue. Defendant Hunter Advisors, LLC ("Hunter Advisors") is a California LLC that acted as the investment adviser

to Hunter Fund, Ltd.[2] All of Hunter Advisors' securities trades were directed through HWM.

Defendant Todd Ficeto ("Ficeto"), a California resident, is the current owner of HWM. Ficeto was a registered representative, trader, branch manager, and general securities principal of HWM. He was also the principal of Hunter Advisors and portfolio manager for Hunter Fund, Ltd.

Defendant Florian Homm ("Homm"), a resident of Spain during much of the relevant period, was the co-owner of HWM during the alleged fraud. He was also the principal investment adviser for the Absolute Funds, the hedge funds whose value was allegedly "pumped" by Defendants' market manipulation scheme.

Defendant Colin Heatherington ("Heatherington"), a resident of Canada, was a trader for Absolute Capital Management Holdings Limited[3] and consequently for the Absolute Funds.

### B. The Alleged Market Manipulation Scheme

According to Plaintiff, Defendants engaged in a nefarious scheme to manipulate domestic securities markets and inflate the value of offshore hedge funds that they managed. Defendants selected U.S. microcap companies, capitalized the compa-

---

1. The FAC is unclear on which corporate Defendants and other relevant entities are currently defunct or are still in existence. Accordingly, we have defined these entities in accordance with Plaintiff's descriptions in the FAC—for example that Hunter Advisors *is* a California LLC, but that Hunter World Markets *was* a Beverly Hills-based broker dealer. (*See* FAC ¶¶ 3–5, 12–21).

2. Hunter Fund, Ltd. ("Hunter Fund") is not a party to this action. It was a British Virgin Islands hedge fund whose sole three investors were three of the Absolute Capital Management Holdings Funds ("ACMH Funds" or "Absolute Funds"). The ACMH Funds, also

non-parties, were eight hedge funds that were all domiciled in the Cayman Islands and managed by Absolute Capital Management Holdings Limited. The Absolute Funds had brokerage accounts at HWM, and U.S. individuals and entities invested millions of dollars in the Funds.

3. Absolute Capital Management Holdings Limited ("ACMH"), another nonparty, is a London-based hedge fund management company and SEC-registered investment adviser whose primary function was to manage the Absolute Funds. Homm was ACMH's co-founder and principal investment adviser.

nies with money from the Absolute Funds, and then brought the companies public. (FAC ¶ 26). These companies, or "Issuers," were quoted and traded on the domestic over-the-counter market: namely, on the Over–the–Counter Bulletin Board ("OTCBB") and "Pink Sheets."[4] Once the companies were capitalized and publicly traded, Defendants allegedly purchased shares and engaged in manipulative trading tactics to inflate the prices of the companies' stock.

▮ Defendants allegedly engaged in matched orders, "marking the close" transactions, and wash trades, (FAC ¶¶ 30–35): manipulative trading techniques that are prohibited by the Securities Exchange Act of 1934 ("Exchange Act") because they are "intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 & n. 21, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). " 'Matched' orders are orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Hochfelder,* 425 U.S. at 205 n. 25, 96 S.Ct. 1375. "Marking the close" transactions involve making extensive and successive purchases toward the end of the day to artificially increase the closing price of a security. *See SEC v. Masri,* 523 F.Supp.2d 361, 369–70 (S.D.N.Y.2007). Wash trades involve selling securities at about the same time as purchasing the exact same securities, which results in no change of ownership of the stock. *See Hochfelder,* 425 U.S. at 205 n. 25, 96 S.Ct. 1375; *DeMartino v. Commissioner of Internal Revenue,* 862 F.2d 400, 404 (2d Cir. 1988); *SEC v. Badian,* 822 F.Supp.2d 352, 360–61, No. 06 Civ. 2621(LTS), 2011 WL 4526104, at *6 (S.D.N.Y. Sept. 29, 2011).

According to the SEC, Homm and Ficeto directed traders (including Heatherington) to place buy or sell orders for Issuers' stock at specific times and in specific quantities in an effort to manipulate the price of those stocks. After receiving buy or sell orders in Issuers' stock from the Absolute Funds, HWM would execute those orders in the over-the-counter marketplace either internally (by identifying a buyer and seller with brokerage accounts at HWM) or externally (by buying from or selling to clients of another brokerage house). (FAC ¶ 28). HWM would then report the trade to FINRA (an independent securities regulator), which would publicly disseminate the trading price and volume to the market. (*Id.*) Defendants' manipulative trading tactics artificially inflated the value of the Issuers' stock, and consequently, the value of the Absolute Funds, which held the Issuers' stocks. Moreover, as a result of their actions Defendants allegedly made millions of dollars from stock sales, sales credits, commissions, and fees. (*Id.* ¶¶ 41–47).

4. The OTCBB is an interdealer electronic quotation system that displays real-time quotes, last-sale prices, and volume information for many domestic over-the-counter equity securities that are not listed on the NASDAQ stock exchange or a national securities exchange. Broker-dealers can use the OTCBB to look up prices or enter quotes for over-the-counter securities. *OTC Bulletin Board (OTCBB),* U.S. SECURITIES & EXCHANGE COMMISSION, http://www.sec.gov/answers/otcbb.htm (last updated June 25, 2007). The Pink Sheets also provide electronic quotations, trading, messaging, and information platforms for the over-the-counter securities market. Brokers can use the Pink Sheets to publish bid and ask prices. *OTC Markets Group Inc.,* U.S. SECURITIES & EXCHANGE COMMISSION, http://www.sec.gov/answers/pink.htm (last updated Feb. 3, 2011).

Plaintiff's FAC asserts the following claims: (1) fraud in the offer or sale of securities, § 17(a) of the Securities Act of 1933 ("Securities Act"); (2) fraud in connection with the purchase or sale of securities, § 10(b) of the Exchange Act and Rule 10b–5 thereunder; (3) fraud by broker-dealer in connection with the purchase or sale of securities, § 15(c)(1) of the Exchange Act; (4) broker-dealer failure to maintain required records, § 17(a) of the Exchange Act and Rules 17a–4(b)(4) and 17a–8 thereunder; (5) investment-adviser fraud, § 206(1)-(2) of the Investment Advisers Act.

## II. Legal Standard for Motion to Dismiss Under Rule 12(b)(6)

To survive dismissal for failure to state a claim, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). It must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009).

## III. Pleading Requirements

■ Plaintiff does not dispute that its securities fraud allegations in the FAC are governed by Rule 9(b), which requires it to "state with particularity the circumstances constituting fraud or mistake." This means that Plaintiff must allege the "who, what, when, where and how" supporting its fraud-based allegations made in the FAC.

*Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003).

■ Defendants argue that the FAC fails to meet Rule 9(b)'s standards. They claim the FAC fails to distinguish each Defendant and allege with particularity the role each had with respect to each purported wrongful transaction. We disagree. To comply with Rule 9(b), Plaintiff need not provide every factual detail supporting its fraud claim—indeed, the SEC is not required to prove its case in the pleadings. Rather, the FAC must not make "conclusory allegations of fraud." *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1239 (N.D.Cal.1998) (citing *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989)). Plaintiff's allegations must be sufficiently specific "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (quoting *Semegen v. Weidner,* 780 F.2d 727, 732 (9th Cir.1985)). In this case, Plaintiff's FAC clearly meets the Rule 9(b) standard. The SEC provides detailed information regarding each Defendant, his (or its) role in the fraudulent transactions, the specific fraudulent acts that were allegedly performed, and how the acts constitute fraud (that is, how the actions misled and manipulated the market).

■ Defendants also argue that the FAC's Appendices—wherein Plaintiff lists each allegedly fraudulent transaction—provide insufficient information to fulfill 9(b)'s "who, what, when, where, and how" requirement. Defendants state that the FAC "identifies hundreds of trades that it alleges were fraudulent. The fact that there are a lot of trades does not make the burden on the SEC *easier*—to the contrary, the Rule 9(b) pleading burden applies as rigorously to a case with 100 al-

leged wrongful acts as to 1." (Mot. 24). Defendants' argument is unconvincing and insufficiently supported. The Appendices provide specific *evidence* of the fraudulent conduct alleged, but each trade is not a separate claim. At the pleading stage, Plaintiff need not provide a complete evidentiary showing as to each individual *transaction* within its claims.

## IV. Investment Advisers Act Claim

■ Plaintiff alleges that Ficeto and Hunter Advisors, as investment advisers to the Hunter Fund, actively participated in the fraud alleged in this case and thus defrauded the Hunter Fund's clients in violation of 15 U.S.C. § 80b–6(1)–(2). Defendants argue that Plaintiff's Investment Advisers Act claim is "fatally defective." Although not clear, Defendants appear to argue that this claim is impossible because the Hunter Fund's only clients were three of the Absolute Funds, and the de facto controller of the Absolute Funds— Homm—was actively involved in the alleged fraud. Because Homm cannot defraud himself, Ficeto and Hunter Advisors could not have violated the Advisers Act by defrauding a client who was aware of the fraud.

We disagree. Homm and the Absolute Funds are not identical entities—indeed investors in the Absolute Funds have brought actions against Homm based on the fraud that he allegedly committed. *See, e.g., Absolute Activist Value Master Fund Ltd. v. Homm*, No. 09 CV 008862, 2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010). Homm's alleged control of the Absolute Funds only highlights the duty Homm had to investors to invest with prudence; it does not insulate him or his alleged coschemers from liability for their fraud, which allegedly resulted in significant losses to investors. Accordingly, we **DENY** Defendants' Motion as to Plaintiff's Investment Advisers Act claim against Ficeto and Hunter Advisors.

## V. Section 10(b) Claim

■ Plaintiff asserts that Defendants' use of "marking the close" transactions, wash trades, and matched orders violated § 10(b) of the Exchange Act and Rule 10b–5 thereunder. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 makes it "unlawful for any person ... (a) [t]o employ any device, scheme, or artifice to defraud, ... or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. Defendants argue that by applying this section to transactions between foreign purchasers and sellers on the domestic over-the-counter securities market, the SEC impermissibly seeks to apply § 10(b) extraterritorially in contravention of *Morrison v. National Australia Bank Ltd.*, —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010).

*Morrison* involved the extraterritorial reach of § 10(b) of the Exchange Act. *Morrison* was a "foreign-cubed action": one in which "(1) *foreign* plaintiffs [were] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries." *Morrison*, 130 S.Ct. at 2894 n. 11 (Breyer, J., concurring in part and concurring in the judgment) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 172 (2d Cir.2008)). An Australian bank (the defendant) purchased an American mortgage servicing company in

1998. For three years, the bank touted the success of the American company's business in its annual reports and public documents and statements. But in 2001, the Australian Bank wrote down the value of the American company's assets by more than $2 billion, which resulted in a drop in the value of the Australian bank's stock. Australian Plaintiffs who had purchased stock in the Australian bank between 1998 and 2001—the bank's stock was sold on the Australian Stock Exchange and other foreign exchanges, but not on any U.S. exchanges—sued the bank in the Southern District of New York alleging that the bank had manipulated the American company's financial models to make its business appear more valuable than it actually was. *Id.* at 2875–76.

Before *Morrison,* the courts of appeals (spearheaded by the Second Circuit) had adopted two tests to determine whether U.S. securities laws applied extraterritorially. The "effects test" examined "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens"; the "conduct test" examined "whether the wrongful conduct occurred in the United States." *See id.* at 2879 (quoting *SEC v. Berger,* 322 F.3d 187, 192–93 (2d Cir.2003)).

The Supreme Court rejected this line of cases because these tests had no textual basis. *Id.* at 2879. The Court returned to the basic principle that unless a contrary intent appears, legislation is meant to apply only within the territorial jurisdiction of the United States. *Id.* at 2881. It adopted a "transactional" test, which focuses "not upon the place where deception originated, but upon purchases and sales of securities in the United States." *Id.* at 2884. The Court held that § 10(b) applied only to "securities listed on domestic exchanges, and domestic transactions in other securities." [5] *Id.* Applying this rule to the facts of the case before it, the Court dismissed the action because the "case involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of . . . occurred outside the United States." *Id.* at 2888.

The instant action, of course, does not involve securities sold on foreign exchanges. The FAC alleges that Defendants engaged in manipulative techniques in purchasing and selling securities that were traded on the over-the-counter securities market: specifically, the OTCBB and Pink Sheets. Nevertheless, Defendants argue that § 10(b) does not apply to Plaintiff's claims under the test articulated in *Morrison.* They claim the FAC fails to meet *Morrison*'s first prong because the securities at issue were over-the-counter stocks and were not alleged to have been traded on a national exchange. They assert that the FAC also fails to meet *Morrison*'s second prong because Plaintiff has not alleged facts showing the trades at issue were "domestic transactions in other securities." They argue that most of the alleged trades cannot be considered domestic transactions because they involved foreign buyers and foreign sellers. In particular, the wash trades and matched orders were largely transactions between accounts held by the same foreign hedge fund or various foreign hedge funds: "[T]he fact that the transaction between two foreign entities may have routed through the United States is not sufficient

---

5. The Court's holding was phrased in various iterations throughout the opinion. For example: "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange," *id.* at 2886, and "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States," *id.* at 2888.

to trigger U.S. securities laws." (Mot. 17). Finally, they argue that the "marking the close" transactions cannot be considered domestic transactions because the FAC does not identify whether the buyers or sellers in those "marking the close" transactions were domestic or overseas entities.

To accept Defendants' argument, we would have to conclude that the Court in *Morrison* divided all § 10(b) violations into two categories: (1) transactions in securities listed and traded on domestic exchanges, such as the NYSE; and (2) a strange group of bedfellows—transactions in securities listed and traded on foreign exchanges, as well as transactions in any other securities traded domestically or abroad that are not traded on any exchange, such as securities traded on the domestic over-the-counter market, securities traded on foreign over-the-counter markets, and securities in domestic or foreign companies purchased via private placements or other means. If Defendants are correct, § 10(b) automatically applies to any transaction that falls within the first category. But, for transactions that fall within the second category—even transactions on the domestic over-the-counter market—a plaintiff alleging a § 10(b) violation must fulfill an ambiguous and undefined requirement[6] of proving that the purchase or sale of the security occurred in the United States.

We disagree and hold that *Morrison* does not bar the *territorial* application of § 10(b) to manipulative trading on the domestic over-the-counter market. We conclude that Defendants misread and misconceive the scope of the Court's holding in *Morrison.*

### A. Morrison *Distinguished Domestic and Foreign Exchanges, not Domestic Exchanges and the Domestic Over–the–Counter Market*

Defendants assert that because "there is no allegation that the domestic stocks in question were listed on a U.S. exchange, then under *Morrison,* § 10(b) only applies to the facts of this case if the Plaintiff can prove that the trades at issue were domestic transactions." (Mot. at 8–9). This argument proceeds from a false premise. We do not agree that *Morrison* held that fraud on the domestic over-the-counter market does not fall within the prohibitions of § 10(b) except where the trades qualify independently as "domestic transactions." To the contrary, transactions on the domestic over-the-counter market are as inherently imbued with our national interest as trades on national exchanges. Defendants are simply incorrect that the bright line drawn in *Morrison* was between domestic exchanges on the one hand, and foreign exchanges, foreign or domestic over-the-counter markets, and other securities transactions such as private placements from either foreign or domestic sources on the other hand. Taken as a whole, the *Morrison* opinion clearly demonstrates that the Court was focused on securities *exchanges* due to the facts presented in that case, and only intended to draw a bright line between foreign and domestic exchanges.

The Court framed the issue before it narrowly: "We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities

---

**6.** In *Morrison,* the Court did not define what kind of transactions would fall into this second category, because in that case "all aspects of the purchases ... occurred outside the united States." *Id.* at 2888. The Court only stated that "[w]ith regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales." *Id.* at 2885.

traded on foreign exchanges." *Morrison,* 130 S.Ct. at 2875. Nothing in that statement of the key issue before the Court suggests that the Court was confronted with fraud on the domestic over-the-counter market. The Court's emphasis on exchanges, and on drawing a bright line between domestic and foreign exchanges, continued throughout the opinion. It quoted the purpose of the Act to illustrate its desire to draw a bright line between foreign and domestic exchanges, not between domestic exchanges and the domestic over-the-counter market:

> [T]he first sentence of the section ... declares that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interests." § 78(b). Nothing suggests that this *national* public interest pertains to transactions conducted upon foreign exchanges and markets.

*Id.* at 2882. The Court's choice of this quote to highlight Congress's stated purpose also demonstrates its knowledge of Congress's concern with both national exchanges and the domestic over-the-counter market.

**B.  *The* Morrison *Court Tethered Its Test to the Text of the Exchange Act***

In interpreting § 10(b), the Court repeatedly stated that it was attempting to apply the Act in a way that effectuates the purpose of the statute, as expressed in the text of the Act itself. *See Morrison,* 130 S.Ct. at 2886 ("It is our function to give the statute the effect its language suggests ...."); *id.* at 2881 n. 5 ("But when it comes to 'the scope of [the] conduct prohibited by [Rule 10b–5 and] § 10(b), the text of the statute controls our decision.'" (alteration in original) (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994))).

The Court's primary criticism of the Second Circuit's "conduct" and "effects" tests was that these tests were not grounded in the text of the Act. *See Morrison,* 130 S.Ct. at 2879 ("[W]hether to apply § 10(b) even to predominantly foreign transactions became a matter of whether a court thought Congress wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." (citations and internal quotation marks omitted)). The Court was deeply troubled by lower courts' use of "judicial-speculation made-law—divining what Congress would have wanted if it had thought of the situation before the court." *Id.* at 2881. It instead chose to apply the presumption against extraterritoriality to purchases of securities in which there was no textual basis for the application of § 10(b)—namely, those on foreign exchanges.

Unlike the foreign exchanges that the Court confronted in *Morrison,* we need not "divin[e] what Congress would have wanted had it thought of th[is] situation" because the text of the Exchange Act and the Act's legislative history clearly support the application of § 10(b) to the transactions at issue in this case: transactions in securities on the domestic over-the-counter market. The Exchange Act's stated purpose is "[t]o provide for the regulation of securities exchanges *and of over-the-counter markets* operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices *on such exchanges and markets,* and for other purposes." Securities Exchange Act of 1934, 48 Stat. 881 (1934) (emphasis added). The Act's Senate Report likewise noted the "unorganized 'over-the-counter' markets" that the bill addressed and that it was "vitally necessary" to provide the Commission with authority "to subject [over-the-counter markets] to regulation

similar to that prescribed for transactions on organized exchanges." S.Rep. No. 73–792, at 6 (1934). Thus, the textually grounded purpose of the Act is to treat securities traded on the domestic over-the-counter market (for example, via the OTCBB and Pink Sheets) similar to securities traded on national exchanges, having drawn no distinction in articulating the need to regulate both.

The Act's structure also demonstrates that § 10(b) applies to market manipulation of over-the-counter securities. In the Exchange Act, Congress specifically and explicitly designated some provisions to be applied only to securities traded on national exchanges, other provisions to be applied only to securities traded on the over-the-counter market, and still others to cover both national exchanges and the over-the-counter market.[7] For example, § 15(c)(1)(a) prohibits brokers from effect-ing any transaction in a security "otherwise than on a national securities exchange" by means of manipulative devices. Section 9(a)(1) prohibits any person from manipulating trading "in any security registered on a national securities exchange." But § 10(b)—the section at issue here—contains no such limitation and instead refers to "any security registered on a national securities exchange or any security not so registered." The rule promulgated under § 10(b), Rule 10b–5, similarly refers to fraud or deceit "in connection with the purchase or sale of *any security.*" *See* 17 C.F.R. § 240.10b–5 (emphasis added).[8]

Decades of case law demonstrates courts' universal agreement that the application of § 10(b) to fraud in connection with over-the-counter securities is not "judicial-speculation made-law." On a broad level, courts have recognized Congress's

---

7. The Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, 124 Stat. 1376 (2010), changed some of these designations. The amendments are irrelevant in this case, though, as Dodd–Frank did not contain any retroactive provisions. Thus, we discuss the statutory structure based on the pre-Dodd–Frank version of the Exchange Act. In any event, Dodd–Frank did not categorically exclude the over-the-counter market from regulation under the Exchange Act. To the contrary, Dodd–Frank tightened regulation over some over-the-counter securities: perhaps most significantly, the over-the-counter derivatives markets. *See* Mark Jickling & Kathleen Ann Ruane, Cong. Research Serv., R41398, The Dodd–Frank Wall Street Reform and Consumer Protection Act: Title VII, Derivatives (2010) (describing new requirements that Dodd–Frank imposes on the over-the-counter derivatives market).

8. Courts have repeatedly acknowledged and invoked this statutory structure when discussing which sections of the Act apply to fraud on a particular type of market. *See, e.g., Dorfman v. First Boston Corp.,* 336 F.Supp. 1089, 1097 (E.D.Pa.1972) ("The Exchange Act has several provisions which prohibit fraudu-lent and deceptive practices. Section 9 deals with deceptive practices concerning securities registered on a national securities exchange, § 15 regulates the over-the-counter markets, and § 10(b) covers both."); *SEC v. Resch–Cassin & Co., Inc.,* 362 F.Supp. 964, 975 (S.D.N.Y.1973) ("It is well settled that the manipulative activities expressly prohibited by § 9(a)(2) of the Exchange Act with respect to a [security listed on a national exchange] are also violations of § 17(a) of the Securities Act and § 10(b) of the Exchange Act when the same activities are conducted with respect to an over-the-counter security."); *SEC v. Sierra Brokerage Servs., Inc.,* 608 F.Supp.2d 923, 961 (S.D.Ohio 2009) ("Sections 17(a) and 10(b) ... prohibit the same conduct as Section 9(a)(2) with respect to OTCBB stocks ...."); *see also* Ted Kamman & Roy T. Hood, *With the Spotlight on the Financial Crisis, Regulatory Loopholes, and Hedge Funds, How Should Hedge Funds Comply with Insider Trading Laws,* 2009 Colum. Bus. L.Rev. 357, 366 ("[C]ourts have held that Congress intended Section 10(b) to apply to all purchases and sales of securities, even if the security is only thinly or privately traded. For example, it applies to ... the trading of securities in the 'pink sheets.' ").

efforts to treat the two types of markets similarly in enacting this legislation. In *Hochfelder*, 425 U.S. at 195, 96 S.Ct. 1375, the Supreme Court, citing legislative history, recognized the intent to prevent market manipulation in both types of markets: "The 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *See also Fridrich v. Bradford*, 542 F.2d 307, 324 n. 3 (6th Cir. 1976) (noting that the over-the-counter trading markets were "the original targets of Congress in 1934"); *Hundahl v. United Benefit Life Ins. Co.*, 465 F.Supp. 1349, 1361 (N.D.Tex.1979) (citing the Act's Senate Report and noting that "Congress intended the over-the-counter markets to be subject to the same stringency of regulation as the organized securities markets").

On a more granular level, courts from many jurisdictions have consistently cited specific textual provisions in holding that the Exchange Act applies to market manipulation on the over-the-counter market. *See, e.g., Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879, 884 (N.D.Ohio 1998) ("Section 10–(b) of the 1934 Act ... expressly prohibits any person from 'directly or indirectly' employing any 'manipulative or deceptive device or contrivance' in either the exchange markets or the over-the-counter markets."); *SEC v. Sayegh*, 906 F.Supp. 939, 946 (S.D.N.Y.1995) ("When manipulative conduct is engaged in with respect to an OTC security, that conduct violates § 10(b) of the Exchange Act and Rule 10b–5 thereunder."); *SEC v. Kimmes*, 799 F.Supp. 852, 859 (N.D.Ill.1992) ("[A]ctivities that falsely persuade the public that activity in an over-the-counter security is 'the reflection of a genuine demand instead of a mirage' are outlawed by 1933 Act § 17(a) and 1934 Act § 10(b)." (quoting *Resch–Cassin*, 362 F.Supp. at 975)); *Byrnes v. Faulkner, Dawkins & Sullivan*, 413 F.Supp. 453, 458 (S.D.N.Y. 1976) ("Section 17 of the 1933 Act ... [and] Section 10(b) of the 1934 Act ... cover transactions in the over-the-counter market."); *see also Griffin v. GK Intelligent Systems, Inc.*, 87 F.Supp.2d 684, 688 (S.D.Tex.1999) (holding that § 10(b) "can properly be applied in securities fraud cases involving securities traded in the over-the-counter market").[9] Accordingly, it is clear that before *Morrison*, § 10(b) was universally applied to prohibit market manipulation on the over-the-counter market in the same way it was applied to national exchanges.

For us to accept Defendants' argument, then, we would have to determine that *Morrison* silently reversed all of this case law and abandoned the clear text of the statute. We decline to do so. When the Supreme Court reverses a legal principle developed through decades of case law from multiple jurisdictions, it does so loud-

---

**9.** Numerous courts have applied § 10(b) to various types of fraudulent activities involving securities sold on the over-the-counter market. *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir.1996) (excessive markups on securities sold in the over-the-counter market); *Fridrich*, 542 F.2d 307 (insider trading on the over-the-counter market); *Sierra Brokerage*, 608 F.Supp.2d 923 (artificially inflating the value of shares on the OTCBB); *Edward J. Mawod Co. v. SEC*, 591 F.2d 588 (10th Cir.1979) (manipulative trading in stock of obscure over-the-counter company); *SEC v. Simmons*, No. 8:04–CV–2477–T–17MAP, 2008 WL 7935266 (M.D.Fla. Apr. 25, 2008) (misrepresentations, matched orders, and wash sales of securities sold on the Pink Sheets and OTCBB); *SEC v. U.S. Envtl., Inc.*, No. 94Civ.6608(PKL)(AJP), 2003 WL 21697891 (S.D.N.Y. July 21, 2003) (market manipulation of securities sold on the Pink Sheets via wash sales and matched orders); *Resch–Cassin*, 362 F.Supp. 964 (same).

ly and with thorough explanation. One need look no further than *Morrison* itself. The majority opinion was relatively short—only about 14 pages. But the Court spent nearly one-third of those pages explaining and discussing why it was unequivocally reversing forty years of case law regarding the extraterritorial application of § 10(b), particularly as applied to securities traded on foreign exchanges. The Court meticulously discussed the history and development of the "conduct" and "effects" tests in the Second Circuit, addressed lower courts' difficulty administering those tests, explored criticisms of the "conducts" and "effects" approach, and then clearly and unambiguously declared a new rule.

Notwithstanding the decades-long history of courts' equally applying § 10(b) to manipulation of securities traded on national exchanges and on the over-the-counter market, Defendants argue that *Morrison* for the first time distinguished between the two markets in applying § 10(b). Defendants ask us to assume that while loudly and clearly reversing forty years of case law to create a new test for applying § 10(b) depending on whether the securities are traded on national or foreign exchanges, the Supreme Court silently but implicitly reversed decades of case law to now require a different analytical framework to determine the applicability of § 10(b) to securities sold on a domestic over-the-counter market as opposed to those sold on a national exchange. We decline to make this assumption.

Applying § 10(b) to foreign Defendants who purchase or sell securities on the domestic over-the-counter market does not implicate the risks of "judicial-speculation-made-law" because there is a textual basis for such an application. In fact, so applying § 10(b) *effectuates* the purposes of the Act as expressed in the statute's clear text,

while grouping securities traded on the domestic over-the-counter market with securities purchased on foreign exchanges and foreign markets—as Defendants suggest we do—*undermines* the Act's textually expressed purpose. We conclude that the Supreme Court did not purport to overturn the universally accepted principle that § 10(b) applies with equal force to market manipulation on national exchanges and the domestic over-the-counter market.

### C. Other Aspects of Morrison Indicate that the Court Did Not Consider the Domestic Over–the–Counter Market to Be Affected by Its Holding

*Morrison* was not focused on the domestic over-the-counter market because the Court was not faced with fraud on that market. The Court's discussion of the Exchange Act's prologue further illustrates that it did not in any way consider transactions on the domestic over-the-counter market to be affected by its holding. The Court quoted the prologue to support the distinction it explicitly drew in that case: that while domestic exchanges and markets fall within the public interest and the boundaries of § 10(b), foreign exchanges do not. The Court stated:

The *primacy of the domestic exchange* is suggested by the very prologue of the Exchange Act which sets forth as its object "[t]o provide for the regulation of securities exchanges ... operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges ...." 48 Stat. 881. We know of no one who thought that the Act was intended to "regulat[e]" foreign securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so. The Act's registration require-

ments apply only to securities listed on national securities exchanges. 15 U.S.C. § 78*l*(a).

*Morrison,* 130 S.Ct. at 2884–85 (emphasis added) (alterations in original).

This passage contains two important clues on whether *Morrison* applies to securities transactions on the domestic over-the-counter market. First, the prologue of the Act *actually* reads as follow (with emphasis added to indicate omitted portions): "To provide for the regulation of securities exchanges **and of over-the-counter markets** operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges **and markets** ...." 48 Stat. 881. The only logical reason that the Court felt free to omit the portions of the prologue referring to the over-the-counter market is that it deemed those portions entirely irrelevant to its opinion because its holding did not implicate the domestic over-the-counter market. If, as Defendants contend, the *Morrison* Court actually intended to draw a bright line between domestic exchanges and the over-the-counter market, then the Court's omission of the prologue's reference to the over-the-counter market would be deceptive and misleading. We decline to assume that the Supreme Court intended to selectively and deceptively omit relevant portions of a statute's language. Accordingly, we draw the only logical conclusion possible under the circumstances: the Court considered the domestic over-the-counter market to be unaffected by its holding.

Second, the Court's statement that "[t]he Act's registration requirements apply only to securities listed on national securities exchanges," supported by a citation to 15 U.S.C. § 78*l*, is only factually correct if compared with the lack of registration requirements for *foreign* securities exchanges. Put another way, it is true that the Act's registration re-

quirements apply to securities listed on national exchanges but not to securities listed on foreign exchanges. As a stand-alone statement of the Act's requirements, though, the Court's statement is unequivocally inaccurate. The Act contains registration requirements that apply to a variety of domestic securities. Most importantly, § 78*l* also requires that securities sold on the over-the-counter market be registered with the SEC, at least where the Issuer's assets and number of shareholders exceed a certain amount. *See* 15 U.S.C. § 78*l*(g); Oren A. Amram, *When Worlds Collide: Transfer Pricing Tax Strategies and the Securities Laws,* 8 U.C. Davis Bus. L.J. 324, 325 n. 1 (2008). Again, we can draw two possible conclusions from the Supreme Court's statement: We can assume that the Court made a clearly inaccurate statement of the law and misstated the clear text of a basic provision of the Exchange Act that was materially relevant to its holding. Or, we can conclude that the Court made a characterization of the statute that is entirely accurate when used to distinguish registration requirements for foreign and domestic exchanges, and that the Court did so because it considered the other types of domestic securities subject to registration requirements to be irrelevant to and outside the scope of its decision. We again decline to assume that the Supreme Court intentionally or otherwise selectively omitted relevant portions of a statute's text and instead draw the conclusion that the Court considered non-exchange domestic securities markets to be unaffected by its holding.

The majority's brief discussion of its second prong ("domestic transactions in other securities"), the prong under which Defendants would have us analyze the transactions at issue in this case, further supports the proposition that domestic over-the-counter securities are unaffected by *Mor-*

*rison.*[10] The Court stated that with regard to transactions analyzed under the second prong, the focus is on domestic purchases and sales. As support for this statement, it referenced provisions of the Exchange Act that state that the Act is inapplicable to "exchange[s] not within or subject to the jurisdiction of the United States" and "securities without the jurisdiction of the United States." *Morrison,* 130 S.Ct. at 2885 (quoting 15 U.S.C. § 78dd(a)-(b)). These provisions were used to illustrate that "it is the foreign location of the transaction that establishes ... the Act's inapplicability." *Id.* That the Court equated foreign exchanges and securities outside the jurisdiction of the United States with the securities and transactions to which its second prong applies suggests that this second prong does not include any securities traded on the domestic over-the-counter market.

Simply put, the application § 10(b) to the domestic over-the-counter market was not before the Court, and we decline to draw a line between exchanges and the over-the-counter market that was not drawn by the Court itself.

### D.  Conflict of Laws Concerns in Morrison

It also bears mention that a significant concern motivating the Court's conclusion in *Morrison* was that applying U.S. securities laws to foreign exchanges would result in a serious conflict with foreign laws. Indeed, the avoidance of conflicts with foreign laws is perhaps the factor most commonly discussed by lower courts applying

*Morrison. See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 765 F.Supp.2d 512, 527 (S.D.N.Y.2011) ("The Court reasoned that in addition to bringing clarity and certainty to the securities law field, the rule it was announcing would avoid conflicts with foreign securities laws."); *UBS Sec. Litig.,* 2011 WL 4059356, at *4. In *Morrison,* the Court stated:

> The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures. Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters. [Numerous countries and foreign industry groups have filed amicus briefs in this case.] They all complain of the interference with foreign securities regulation that application of § 10(b) abroad would produce.

*Id.* at 2885–86 (citation and quotation marks omitted). *Morrison* thus acknowledged the difficulties that could arise if § 10(b) were applied to securities on foreign exchanges that are separately governed by foreign regulatory bodies.[11]

---

**10.** The Court provided little elaboration on this second prong, as it found that not a single aspect of the purchases at issue occurred in the United States.

**11.** Several cases have since discussed this concern in similarly deciding that *Morrison* barred particular claims. *See, e.g., In re Royal Bank of Scotland Group PLC Sec. Litig.,* 765 F.Supp.2d 327, 337 (S.D.N.Y.2011) (where se-

curities were sold only on a foreign exchange); *Elliott Associates v. Porsche Automobil Holding SE,* 759 F.Supp.2d 469, 476 (S.D.N.Y.2010) ("In light of *Morrison*'s strong pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate, I am loathe to create a rule that would make foreign issuers with little relationship to the U.S.

However, this concern is not present in the context of securities purchased on the domestic over-the-counter market. The domestic over-the-counter securities market is governed by domestic regulatory laws— indeed, several provisions of the Securities Act and Exchange Act regulate the over-the-counter marketplace, as discussed previously. Although not all of the provisions in these Acts or the regulations promulgated thereunder apply to securities sold on the over-the-counter market, it certainly is not the case that any foreign countries regulate the American over-the-counter market.

The Court's extensive discussion of its conflict of laws concerns demonstrates that it was wary of the wholesale exportation of U.S. securities laws to other countries' exchanges. The Court's concern was not the continued application of § 10(b) to the domestic over-the-counter market, which was already regulated by U.S. securities laws and most certainly not regulated by foreign countries' laws. As such, applying § 10(b) with the same force to national exchange and the domestic over-the-counter market does not implicate potential conflicts with foreign laws that concerned the Court in *Morrison*.

### E. Post–Morrison *Case Law Does Not Support Defendants' Position*

*Morrison* simply cannot credibly be read to bar the application of § 10(b) to the transactions at issue in this case. Lower courts' post-*Morrison* cases do not compel a contrary conclusion. No post-*Morrison* case has presented precisely this set of facts: the application of § 10(b) to a case brought by an American plaintiff against foreign and American Defendants,

claiming that the Defendants defrauded the U.S. over-the-counter securities market using market manipulation techniques. Courts have dismissed § 10(b) claims involving securities that were traded on foreign exchanges but also listed (but not traded) on domestic exchanges. *See, e.g., Royal Bank of Scotland,* 765 F.Supp.2d at 336 ("The idea that a foreign company is subject to U.S. Securities laws everywhere it conducts foreign transactions merely because it has 'listed' some securities in the United States is simply contrary to the spirit of *Morrison*."). Cases have similarly held that § 10(b) does not reach transactions in a foreign company's shares that are traded only on a foreign exchange but where American Depository Receipts (ADRs) representing those shares are listed and traded on an American exchange. In these cases, courts have held that ADRs are merely placeholders for the ordinary shares traded on foreign exchanges, and thus allowing § 10(b) claims to survive would likewise be contrary to the spirit of *Morrison*.[12] *See, e.g., Vivendi Universal,* 765 F.Supp.2d 512; *In re Société Générale Sec. Litig.,* No. 08 Civ. 2495(RMB), 2010 WL 3910286, at \*6 & n. 5 (S.D.N.Y. Sept. 29, 2010). These cases do not undermine our decision, as the securities in this case were not traded on any foreign markets.

Several other post-*Morrison* cases have involved domestic plaintiffs who purchased securities on foreign exchanges but filed § 10(b) claims due to misrepresentations allegedly made to induce the domestic plaintiffs to buy foreign stocks. In these cases, courts have consistently held that *Morrison* bars the plaintiffs' § 10(b) claim. *See, e.g., Plumbers' Union Local No. 12*

---

subject to suit here simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stock." (citation omitted)).

12. These cases seem particularly correct given that notwithstanding *Morrison*'s broad pronouncement of its holding, the securities at issue in *Morrison* had ADRs that were traded on the NYSE. *Morrison,* 547 F.3d at 168.

*Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 178 (S.D.N.Y.2010) (dismissing § 10(b) claim and stating that "as a general matter, a purchase order in the United States for a security that is sold on a foreign exchange is insufficient to subject the purchase to the coverage of section 10(b) of the Exchange Act"). For example, *Cascade Fund, LLP v. Absolute Capital Management Holdings Ltd.,* No. 08–cv–01381–MSK–CBS, 2011 WL 1211511 (D.Colo. Mar. 31, 2011), involved the same funds at issue in the instant action—the Absolute Funds. However, in *Cascade,* domestic investors filed suit against Homm and others, alleging that the defendants induced the plaintiffs to initially invest in the Absolute Funds by way of misleading statements in the Funds' offering memoranda. *Id.* at *1–2. The transaction at issue in *Cascade,* then, was the plaintiffs' investment into one of the Absolute Funds, which was listed on foreign securities exchanges. The plaintiffs in *Cascade* did not assert any claims related to market manipulation on the domestic over-the-counter market or domestic exchanges. Thus, the court's determination that *Morrison* barred the plaintiffs' claims in *Cascade* does not in any way affect our conclusion in the instant case, as the transactions at issue here were those made on the domestic over-the-counter market.

Still other cases have involved "private placements"—privately negotiated sales of securities between parties that do not occur on any open securities market. For example, in *Absolute Activist Value Master Fund Ltd. v. Homm,* No. 09 CV 08862(GBD), 2010 WL 5415885 (S.D.N.Y. Dec. 22, 2010), the court held that after

*Morrison,* § 10(b) did not apply to the sale of securities that were "[a]t no point ... released to the general market," *id.* at *5, "but were rather purchased directly from the [Issuers] pursuant to private placements known as PIPE (public investment in private equity) transactions," *id.* at *2, and "no transaction occurred in the United States," *id.* at *5.[13] *See also Elliott Associates,* 759 F.Supp.2d 469, 476 (S.D.N.Y. 2010) (involving security-based swap agreements—"privately negotiated contracts that are not traded on any exchanges"—and holding that *Morrison* barred the application of § 10(b) to the swaps because the "swaps were the functional equivalent of trading the underlying shares on a German exchange"); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.,* 798 F.Supp.2d 533 (S.D.N.Y.2011) (involving collateralized debt obligations that were privately purchased and not traded on any market). Such privately negotiated purchases between individually contracting parties, one of whom is foreign and the other domestic, that are not made on the open market cannot automatically be considered domestic *or* foreign transactions. For such transactions, it makes more sense to closely examine the details of the transaction—as courts have done—to determine whether the transaction could reasonably be considered a domestic transaction. This factual inquiry is unnecessary to determine the territorial application of § 10(b) in the context of securities sold on the domestic over-the-counter market, even if the purchaser were located abroad. *See UBS Sec. Litig.,* 2011 WL 4059356, at *7 ("[T]here is nothing in the text of *Morrison* to suggest

---

**13.** Defendants suggest that *Absolute Activist* already dismissed "almost the same sets of allegations" under *Morrison.* (Mot. 9). We disagree. Although *Absolute Activist* involved the same hedge funds and several of the same Defendants in this case, the allegations here are very different. *Absolute Activist* focused on investments made via private placements, of stocks never released to the general market, while the instant case focuses on the manipulative trading on the domestic over-the-counter securities market of stocks traded publicly in the United States.

that the Court intended the location of an investor placing a buy order to be determinative of whether such a transaction is 'domestic' for purposes of § 10(b).").

## VI. Conclusion

*Morrison* was concerned with the extraterritorial application of § 10(b). *See Morrison*, 130 S.Ct. at 2883 (concluding that § 10(b) does not apply extraterritorially); *In re UBS Sec. Litig.*, No. 07 Civ. 11225(RJS), 2011 WL 4059356, at \*5 (S.D.N.Y. Sept. 13, 2011) (discussing "the *Morrison* Court's clear intention to limit the extraterritorial reach of § 10(b)"); *United States v. Sumeru*, 449 Fed.Appx. 617, 621 (9th Cir.2011) ("*Morrison* concerned the extraterritorial application of § 10(b) ...."). Market manipulation of domestic over-the-counter securities simply does not implicate the extraterritorial application of our securities laws. Accordingly, *Morrison* does not bar the application of § 10(b) to the facts presented in this case: foreign and domestic Defendants who allegedly engaged in manipulative trading tactics on the domestic over-the-counter securities market. We hereby **DENY** Defendants' Motion as to Plaintiff's § 10(b) claim. In addition, Defendants argue that the SEC's claims for violations of § 17(a) of the Securities Act, § 15(c)(1) of the Exchange Act, and § 206(1)-(2) of the Investment Advisers Act should be dismissed for the same reasons as the § 10(b) claim. In light of the foregoing, we hereby **DENY** Defendants' Motion as to these claims as well.

Defendants' Motion is **DENIED** in its entirety. Defendants SHALL answer Plaintiff's FAC **within twenty-one (21) days hereof.**

**IT IS SO ORDERED.**