**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Perry A. GRUSS, Defendant.**

**No. 11 Civ. 2420.**

United States District Court,
S.D. New York.

May 9, 2012.

654

George S. Canellos, Esq., Todd D. Brody, Esq., Securities & Exchange Commission, New York, NY, for Plaintiff.

Nathaniel H. Akerman, Esq., Thomas O. Gorman, Esq., Cecilie Howard, Esq., Dorsey & Whitney LLP, New York, NY, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Perry Gruss ("Gruss" or the "Defendant") has moved to dismiss the amended complaint (the "Complaint") brought by the plaintiff U.S. Securities and Exchange Commission (the "SEC" or the "Plaintiff") for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and for failure to set forth a plausible cause of action pursuant to Fed.R.Civ.P. 8(a) and 9(b).

Upon the facts and conclusions set forth below, the Defendant's motion is denied.

### I.  Prior Proceedings

The SEC filed its initial complaint on April 8, 2011 seeking enforcement of the Investment Advisers Act of 1940 (the "IAA"), 15 U.S.C. § 80b–6. On June 10, 2011, the SEC amended and filed its Complaint. The Complaint sets forth a claim for relief against Gruss consisting of four separate alleged frauds, charged as aiding and abetting violations of Sections 206(1) and (2) of the IAA.

The four separate frauds alleged in the Complaint are (1) the misappropriation of cash belonging to an offshore fund for onshore fund investments, (2) the misappropriation of cash belonging to an offshore fund for the repayment of a credit facility for an onshore fund, (3) the early withdrawal of management fees from unspecified managed client funds, and (4) funds taken from an onshore fund and an unidentified managed client fund for the purchase of an airplane. The Complaint seeks injunctive relief, disgorgement and civil penalties against Gruss pursuant to Section 209(e) of the IAA.

Invoking Rules 12(b)(6), 8(a) and 9(b) of the Federal Rules of Civil Procedure, Gruss moved to dismiss the Complaint on July 15, 2011.

The instant motion was heard and marked fully submitted on September 28, 2011.

### II.  Background

The following factual background is drawn from the Complaint and from documents referenced in or integral to the Complaint. The allegations of the Complaint are accepted as true for the purposes of this motion, see Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002), and do not constitute findings of fact by the Court.

D.B. Zwirn & Co. L.P. ("DBZCO"), now defunct, was a New York-based limited partnership and unregistered investment adviser. From 2 002 through 2009, DB2CO managed five hedge funds, including the D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund") and the D.B. Zwirn Special Opportunities Fund, L.P. (the "Onshore Fund"). The Offshore Fund and the Onshore Fund were separate entities with largely distinct pools of investors. The Onshore Fund faced a chronic cash shortage because its investment opportunities exceeded its available funds. In contrast, the Offshore Fund had more cash than investment opportunities due to its inability to make investments or loans to U.S. businesses without being subject to tax liability.

From March 1, 2004 through October 4, 2006, DBZCO had no written accounting policies or procedures. Instead, the de facto policy was that all transfers of cash of any size had to be expressly approved by Gruss, the Chief Financial Officer ("CFO") of DBZCO. Gruss' approval was effectuated by his affirmative response to email requests sent to him or through his personal signing or authorizing his signature to be affixed to hard copy wire transfer requests.

During this period, Gruss used the signatory and approval authority he had over the funds to authorize more than $870 million in improper transfers of client cash. The cash was transferred both between client funds and from client funds to DBZCO and third parties. More specifically, these transfers included: (i) at least 85 transfers totaling $576 million from the Offshore Fund to the Onshore Fund or directed to third parties to fund Onshore Fund investments; and (ii) $273 million in transfers from the Offshore Fund to repay the Onshore Fund's revolving credit facility.

Gruss personally approved transfers from the Offshore Fund to the Onshore Fund to offset the Onshore Fund's cash shortage. The transfers typically involved the movement of cash from the Offshore Fund's U.S. bank account into a third party's U.S. bank account. The third party, the company receiving the loan or investment, was in many cases a U.S. entity. Similarly, to repay the Onshore Fund's revolving credit facility, Gruss approved the transfer of cash between the accounts for each of the funds at U.S. banks and then on to the U.S. bank account of the provider of the credit facility.

The inter-fund transfers were not investments made by the Offshore Fund in the Onshore Fund. All investment decisions were made by DBZCO's managing partner, who had approval over all potential investments. No approval was given for any inter-fund transfers between the Onshore Fund by the Offshore Fund, and Gruss did not inform DBZCO's managing partner or any of the other DBZCO partners of the practice of transferring money between the funds.

The inter-fund transfers seemingly functioned as loans, in that the money transferred was ultimately repaid. However, no loan agreements were drafted or docu-mented. No interest was paid by the Onshore Fund to the Offshore Fund, even though these transfers were outstanding for an average of *66* days and ranged up to 285 days.

As the size of the transfers grew, two accountants, who worked under Gruss in DBZCO's New York office, repeatedly expressed their concerns over the practice of transferring cash between funds. They informed Gruss that the transfers were inappropriate and requested that he make the partners aware of these activities to facilitate a joint management decision. When Gruss refused and continued the practice of improperly transferring cash between the funds, both accountants resigned from DBZCO.

In addition to the inter-fund transfers, Gruss approved (i) $22 million of early withdrawals of management fees from the accounts of client funds in order to cover DBZCO's operating cash shortfalls; and (ii) a transfer of $3.8 million from the Onshore Fund to partly fund a Gulfstream IV aircraft purchased by DBZCO's managing partner.

Without the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints and might have been unable to fund its cash disbursements for its operating expenses. According to the Complaint, but for the early management fee withdrawals, DBZCO would have overdrawn its operating account by $1.9 million by September 2005, $4.0 million by December 2005 and $9.5 million by March 2006. Gruss was aware of the payment terms in the management agreements and recognized that the early withdrawals amounted to loans of money to fund DBZCO.

In September 2005, DBZCO's managing partner purchased an aircraft costing $17.95 million. At the close of the pur-

chase, DBZCO was faced with a $3.8 million shortfall in available funds. Gruss authorized the transfer of the funds needed to close on the aircraft purchase from the Onshore Fund and a managed account. Despite knowing that money had been misappropriated to purchase the aircraft, Gruss did not inform any of his supervisors or anyone outside of the accounting group that funds had been used for this purpose.

Facing termination, Gruss resigned in October 2006, when at least $108 million of the unauthorized transfers remained outstanding. All of the money improperly transferred was eventually repaid with interest, but only after an internal investigation.

## III. *The Offering Memoranda And Financial Disclosures*

■ Because the SEC references the Offering Memoranda and the financial disclosures in its Complaint, the documents are appropriate for consideration in connection with the Defendant's motion to dismiss.[1]

The three relevant Offering Memoranda for the Offshore Fund are attached to the Declaration of Perry A. Gruss, dated July 13, 2011, as Ex. A, dated April 2002; as Ex. B, dated July 2003; and as Ex. C, dated July 2005. The Audited Financial Statement for the Offshore Fund and the Onshore Fund for 2005 are attached to the Gruss Dec. as Ex. D and Ex. E respectively. The three relevant Offering Memoranda for the Onshore Fund are attached to the Gruss Dec. as Ex. F, dated April 2002; as Ex. G, dated May 2003; and as Ex. H,

dated May 2005. The Audited Financial Statements for the Offshore Fund and Onshore Fund for 2004 are attached to the Gruss Dec. as Ex. I and Ex. J respectively.

*The Offshore Fund*

Each of the Offering Memoranda for the Offshore Fund stated that the fund was incorporated, administered, registered, domiciled and regulated in the Cayman Islands. Specifically, "[t]he Fund was incorporated and registered as an exempted company in the Cayman Islands under the Companies Law (2001 Second Revision) of the Cayman Islands on April 12, 2002" and the Fund's registered office and legal counsel were located in "George Town, Grand Cayman, Cayman Islands, British West Indies." (Ex. A at 30, 32; Ex. B at 32; Ex. C at 56). The Offering Memoranda also stated that the Offshore Fund's Administrator, Registrar and Transfer Agent was Goldman Sachs (Cayman) Trust . . . a company incorporated under the laws of the Cayman Islands and licensed as a mutual funds administrator pursuant to the Mutual Fund Law (2001 Revision) of the Cayman Islands, and that the Offshore Fund's cash in U.S. banks was in the name of the Cayman Administrator. (Ex. A at 21; Ex. B at 20; Ex. C at 32).

In addition, the Offering Memoranda explained that the Offshore Fund was subject to regulation and supervision by the Cayman Islands authorities and that it was obligated to adhere to Cayman Islands law. (Ex. A at 39; Ex. B at 39; Ex. C at 81). It also provided that shares could only be purchased in the Cayman Islands and that monthly statements would be disseminated by the fund's administrator in

---

1. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of and relied on when bringing suit, or matters of which judicial notice may be taken. *See Chambers,* 282 F.3d at 153; *Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 776 (2d Cir. 2002).

the Cayman Islands. (Ex. A at v, 33, Appendix AII–1; Ex. B at v, Appendix AII–1; Ex. C at vii).

While the Offering Memoranda detailed that the Offshore Fund was a foreign entity governed by foreign law, the Complaint alleges that the actual "operational and investment decisions for the Offshore Fund were all made by the Offshore Fund's manager, DBZCO, primarily in DBZCO's New York office such that for all intents and purposes, the Offshore Fund was based in New York." (Compl. ¶ 20).

According to the Complaint, "the accounting for the Offshore Fund's investment and other activities was ... performed primarily in New York, with data being provided to the third party administrator in the Cayman Islands which distributed statements to individual investors," (*Id.* ¶ 22), and that "[a]ll of the Offshore Fund's cash was held at and paid from U.S. bank and brokerage accounts." (*Id.* ¶ 23). The Complaint also asserts that due diligence materials and "offering and subscription documents were distributed to potential investors by DBZCO from its New York office, with the full legal name and address of the Offshore Fund ... listed as in care of DBZCO at DBZCO's address in New York." (*Id.* ¶ 21), and that over "50% of the Offshore Fund's investors were individuals or entities in the U.S." (*Id.* ¶ 18). The Complaint alleges that an unspecified number of "individual investors" received "[m]onthly performance figures ... from DBZCO's investor relations personnel in New York." (*Id.* ¶ 22).

The Offshore Fund's investment objective was to "achieve premium risk-adjusted returns relative to fixed income or money market securities." (*Id.* ¶ 7). The Offering Memoranda explained that the fund would focus on three investment strategies including distressed debt, direct debt investments and special situations. (Ex. A at 7). In addition, the Offshore Fund was allowed to make investments "in U.S. and non-U.S. securities that trade on exchanges or over-the-counter or that are acquired in private placements." (*Id.*).

With respect to the inherent or potential conflicts of interest that may arise, the 2002 Offering Memoranda stated that "[t]he Trading Manager [DBZCO] may have a conflict of interest between its responsibility to act in the best interests of the Fund and any benefit, monetary or otherwise, that may result to it or its affiliates from the operation of the Fund." (*Id.* at 28). In such instances, when there are "available funds for investments, [the Trading Manager may make] investments suitable and appropriate for each." (*Id.* at 29).

In addition, an "inherent conflict of interest exists when the Trading Manager engages in the practice of 'cross trading,' i.e., the Trading Manager effects a trade or a loan between the Fund and another investment fund that it or its affiliates manage, such as the U.S. [Onshore] Fund or the HCC Subsidiary [a Cayman entity]." *Id.* The potential trades contemplated in the Offering Memoranda included the assignment of loans made by the U.S. Fund, to be purchased at their fair market value, or investments to the fund. *Id.* The Offering Memoranda made clear that the Offshore Fund would not "make direct loans to or otherwise engage in the active management of a U.S. company," (Ex. A at 13) but might "accept an assignment of a loan from the U.S. Fund as determined by an independent investment manager, whose judgment from time to time will differ from that of the Trading Manager." *Id.*

The initial Offering Memorandum for the Offshore Fund and all subsequent Offering Memoranda stated that:

Notwithstanding the potential conflicts of interest resulting from these multiple relationships, [DBZCO was] expressly permitted to enter into contracts and transactions with its affiliates on behalf of the [Offshore] Fund.

(Ex. A at 30; Ex. B at 30; Ex. C at 52; Ex. I at 52).

The Onshore Fund served as the sourcing agent for investment assets for the Offshore Fund. (Ex. A at 13–14, 29; Ex. F at 6, 18, 24). The Complaint asserts that the inter-fund transfers between the Offshore Fund to the Onshore Fund were neither interest-bearing loans nor investments (Compl. ¶ 26), and thus "improper" and "inappropriate." (*Id.* ¶¶ 2, 3, 4, 32, 37).

*The Onshore Fund and the Audited Financial Statements*

The Offering Memoranda stated the Onshore Fund operated as a private investment fund under the laws of the State of Delaware. (Ex. F at 6). The fund's investment objective was to "achieve premium risk-adjusted returns relative to fixed income or money market securities in all business cycles." *Id.* DBZCO to achieve the Fund's objective through a combination of "(i) a multiple sub-strategy approach, (ii) disciplined investment selection, (iii) exhaustive due diligence, (iv) vigilant risk management with a focus on capital preservation and (v) attention to business development." (Ex. F at 7). The main investment strategies of the Onshore Fund were to focus on "distressed debt, direct debt investments and special situation equities." *Id.*

The Onshore Fund charged origination and sourcing fees "in connection with the management and servicing of certain portions of the [Offshore] Fund's loan portfolio." (Ex. C at 31). The Offering Memoranda for the Onshore Fund contained identical conflict of interest language as

that of the Offshore Fund. (Ex. F at 6, 23–25).

The Audited Financial Statement for the Offshore Fund for the period ending December 31, 2005, disclosed on its balance sheet that $220,788,666 was "Due from affiliates." (Ex. D at 2). Similar disclosures were contained in the financial statements for the Onshore Fund and for both funds for the period ending December 31, 2004. (Ex. I at 2 ($6,838,050 due); Ex. J at 2 ($7,480,253 due)).

The 2005 Audited Financial Statement also stated that, since its inception in 2002, the Offshore Fund had grown to have just under $2.5 billion in assets with approximately $1 billion in liabilities. (Ex. D at 2). Thus, the Offshore Fund held itself out to have over $1.4 billion in net assets, with a net increase of $100,265,410 resulting from operations. (*Id.* at 20). The 2004 Audited Financial Statement showed approximately $877 million in net assets. (*Id.* at 2). The Audited Financial Statements of the Onshore Fund had similar increases with total assets of just over $1.2 billion in 2004 to over $2.5 billion in 2005. (Ex. E at 2, Ex. J at 2).

## IV. *Discussion*

### A) *The Applicable Standards*

*Rule 12(b)(6) Standard*

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)

(quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

■■■ To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich,* 722 F.Supp.2d 416, 423 (S.D.N.Y.2010). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

*Rule 8(a) and 9(b) Pleading Standards*

In addition, Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). While the standard is liberal, "[t]here must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense)." *Dallio v. Hebert,* 678 F.Supp.2d 35, 53 (N.D.N.Y. 2009).

■■■ Allegations of fraud must also comply with the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting the fraud." Fed. R.Civ.P. 9(b). To satisfy this requirement, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (internal quotation marks and citation omitted). While "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. *Kalnit v. Eichler,* 264 F.3d 131, 137–38 (2d Cir. 2001).

**B) *Morrison Does Not Bar The SEC Enforcement Of the IAA***

■■■ The SEC seeks enforcement of the IAA against Gruss for deceptive acts committed in the U.S. Gruss seeks dismissal on the ground that Section 206 of the IAA, by its terms, cannot be applied extraterritorially in light of the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.,* —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). He argues that Section 206 contains no affirmative intention to give the statute an extraterritorial effect, and thus under *Morrison,* claims predicated on fraud must only be directed at domestic clients because the focus of the IAA is not upon the place where the fraud allegedly originated but upon the location of the client. Because the alleged fraud involved the Offshore Fund, a Cayman Islands entity, Gruss contends that the SEC's enforcement constitutes an impermissible extraterritorial application of the IAA. The SEC disagrees and contends that the reach of *Morrison* does not extend to bar this effort by the SEC to enforce the IAA.

*Morrison* involved a "foreign-cubed" class action: one in which "(1) *foreign* plaintiffs [were] suing (2) a *foreign* issuer in an American court for violations of

American securities laws based on securities transactions in (3) *foreign* countries." *Id.* at 2894 n. 11 (Breyer, J., concurring in part and concurring in the judgment) (emphasis in the original). Three Australian plaintiffs sued an Australian bank, the National Australian Bank, under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), for losses they allegedly suffered on stock purchases traded on Australian exchanges. *Id.* at 2875. The Supreme Court held that a private right of action under Section 10(b) and Rule 10b–5 of the Exchange Act could be maintained by foreign plaintiffs only if: (1) the security was listed on an American stock exchange or (2) the purchase or sale took place in the U.S. *Id.* at 2888 ("Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.").

In reaching its decision, the Court directed its attention to the Act's regulatory center and adopted a "transactional" test, which focused "not upon the place where the deception originated, but upon the purchases and sales of securities in the United States." *Id.* at 2884. This new transactional test replaced the Second Circuit's conduct and effects test, which asked "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens" or "whether the wrongful conduct occurred in the United States." *Id.* at 2879 (quoting *SEC v. Berger*, 322 F.3d 187, 192–93 (2d Cir.2003)). The Court explained that the conduct and effects test lacked textual support in the Exchange Act and contravened the long-standing presumption against extraterritorial application of U.S. legislation in the absence of contrary Congressional intent. *Id.* at 2878. Applying the transactional test to the case before it, the Court con-cluded that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," *Id.* at 2883, and dismissed the action because it "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside of the United States." *Id.* at 2888.

The Supreme Court framed the issue before it narrowly: "We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." *Id.* at 2875. Despite Gruss' attempts to draw parallels between *Morrison* and the instant case, the facts of this action fall outside the narrowly framed issue before the Court.

First, the cause of action in this case is neither private nor brought by a foreign defendant, but rather by the SEC. The SEC is the U.S. government agency specifically entrusted with the task of protecting the investing public by policing the securities markets and preventing fraud. *See generally* 15 U.S.C. § 78u. Moreover, unlike in *Morrison's* "foreign-cubed" scenario, the SEC has alleged claims against a domestic defendant of a domestic investment adviser based upon fraudulent conduct alleged to have occurred in the U.S.

In addition, here the SEC seeks to enforce Section 206 of the IAA, not Section 10(b) or Rule 10b–5 of the Exchange Act, the enforcement of which was sought in *Morrison.* Since *Morrison* was decided, there have been three cases that addressed both its holding and alleged violations of the IAA. *See Valentini v. Citigroup, Inc.*, 837 F.Supp.2d 304 (S.D.N.Y. 2011); *SEC v. Ficeto*, 839 F.Supp.2d 1101 (C.D.Cal.2011); *Horvath v. Banco Comer-*

*cial Portugues, S.A.,* No. 10–4697(GBD), 2011 WL 666410 (S.D.N.Y. Feb. 15, 2011). Each case also involved allegations of fraud under Section 10(b) of the Exchange Act. The decisions discussed *Morrison* when analyzing the Section 10(b) claims only, and gave the IAA claims separate treatment. *Valentini,* 837 F.Supp.2d at 324–25 (dismissing the IAA claim where defendant failed to establish an investment advisor contract, or relationship to confer the right of action); *Ficeto,* 839 F.Supp.2d at 1106–07 (holding that the SEC's IAA claim was not rendered fatally defective by the fact that clients were under the de facto control of the broker-dealer co-owner); *Horvath,* 2011 WL 666410, at *5 (discussing the plaintiff's IAA claims as arising after the parties contracted and therefore subject to the statute).

The distinct purposes behind the Exchange Act versus the IAA help to explain these courts' lack of discussion regarding *Morrison's* impact on the IAA. The purpose of the Exchange Act is to regulate and control "transactions in securities commonly conducted upon securities exchanges and over-the-counter markets." Section 2, 48 Stat. 881 (1934). The purpose of the IAA, however, is to regulate and "to prevent fraudulent practices by investment advisers." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Thus, the Exchange Act focuses "upon purchases and sales of securities in the United States[,]" *Morrison,* 130 S.Ct. at 2884, whereas the IAA focuses on the adviser.

Nonetheless, Gruss insists that the Court's decision in *Morrison* applies because Section 206 of the IAA is the analog of Section 10(b) for investment advisers. Gruss advocates for a plain language approach to Section 206 and argues that "[i]n determining whether a claim seeks an extra-territorial application of a federal statute, the court must look to the 'focus' of that statute." *European Community v. RJR Nabisco, Inc.,* No. 02–5771(NGG)(VVP), 2011 WL 843957, at *4 (E.D.N.Y. Mar. 8, 2011) (citing *Morrison,* 130 S.Ct. at 2883–84). Gruss contends that the focus of the IAA cannot be "upon the place where the deception originated," *Morrison,* 130 S.Ct. at 2884, but as Section 206 states, "on the client or prospective client." 15 U.S.C. § 80b–6. Thus in his view, if the client is located outside the U.S., then the SEC cannot bring suit even if the adviser is located in the U.S.

As demonstrated by its text and regulatory structure, the focus of the IAA is clearly on the investment adviser and its actions. First, Section 201 of the IAA states that Congress "[u]pon the basis of facts disclosed by the record and report of the Securities and Exchange Commission ... found that *investment advisers* are of national concern[.]" 15 U.S.C. 80b–1 (emphasis added). Similarly, Section 206's list of prohibitions begins after stating that "[i]t shall be unlawful for any *investment adviser* by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly...." 15 U.S.C. 80b–6 (emphasis added). Clients and prospective clients are mentioned in the section's subheadings and only in relation to advisers.[2]

---

**2.** Section 206 of the IAA, in relevant part, provides:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]

*Id.* The IAA also requires, among other things, the regulation of investment advisers through their registration (Section 203), the production and retention of certain records and reports (Section 204), and the establishment, maintenance and enforcement of written policies designed to prevent misuse of non-public information (Section 204A). 15 U.S.C. 80b–3; 80b–4.

In addition, a title of a statute or section "can aid in resolving any ambiguity in the legislation's text." *INS v. Nat'l Center for Immigrants' Rights,* 502 U.S. 183, 189–90, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). Section 206 is titled "Prohibited transactions by investment advisers" and coupled with the title of the IAA indicates that advisers are the focus of the act. 15 U.S.C. 80b–6; *see also Fairport, P. & E.R. Co. v. Meredith,* 292 U.S. 589, 594, 54 S.Ct. 826, 78 L.Ed. 1446 (1934) ("Very likely, the primary purpose in the mind of Congress was to protect employees and passengers. So much is indicated by the title—An act to promote the safety of employees and travelers upon railroads. . . ."); *Wash. Water Power Co. v. FERC,* 775 F.2d 305, 325 (D.C.Cir.1985) ("The title of the act indicates that its purpose. . . ."); *I.B.M. v. U.S.,* 480 F.2d 293, 296 (2d Cir.1973), cert. den., 416 U.S. 979, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974) ("The purpose of the Expediting Act, as its very title indicates, is to eliminate piecemeal appeals"); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988) ("It's purpose, as indicated by the title, 'Consumer Protection for Deceptive Acts and Practices,' was to remedy-injury to consumers.").

Section 206 offers no private right of action, further demonstrating that the focus of the IAA is the adviser and not the client. *See, e.g., In re Bayou Hedge Fund Litig.,* 534 F.Supp.2d 405, 420 (S.D.N.Y.

2007), aff'd, 573 F.3d 98 (2d Cir.2009); *SSH Co. v. Shearson Lehman Bros., Inc.,* 678 F.Supp. 1055, 1058 (S.D.N.Y.1987). As the Second Circuit stated, "statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Lindsay v. Ass'n of Prof'l Flight Attendants,* 581 F.3d 47, 53 (2d Cir.2009), cert. den., —— U.S. ——, 130 S.Ct. 3513, 177 L.Ed.2d 1114 (2010). The fact that there is no private right of action is indicative that the focus of the act is the adviser and that clients of the investment adviser are not the "class for whose especial benefit the statute was enacted." *Id.* at 52.

Moreover, section 206, as amended, was also intended to-be a very broad remedy. It applies "to all investment advisers, whether or not such advisers were required to register under § 203 of the Act." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Congress intended that this section not be applied "technically and restrictively, but flexibly to effectuate its remedial purposes." *Capital Gains,* 375 U.S. at 195, 84 S.Ct. 275. It is even broader than Section 10(b) of the Exchange Act, which "quite clearly falls on into the category of remedial legislation." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

> By its own language Section 206(1) and (2) makes illegal "any device, scheme or artifice to defraud," and "any transaction or course of business which operates as a fraud." Considering the broad language of the statute and the fact that the subsections do not even contain the words "misrepresentation" or "omission," it is difficult to conceive of how

15 U.S.C. 80b–6.

Section 206 could be limited to only those concepts.

*SEC v. Moran,* 922 F.Supp. 867, 896 (S.D.N.Y.1996).

Finally, the Supreme Court offered a meticulous review of the IAA's legislative history in *Capital Gains,* 375 U.S. at 186–95, 84 S.Ct. 275, which convinced the Court that Congress enacted the "legislation to prevent fraudulent practices by investment advisers[.]" *Id.* at 195, 84 S.Ct. 275. Any statute designed to oversee and regulate investment advisers will invariably discuss clients and the relationship between them and the adviser.[3] The mere mention of "client or prospective client" does not alter the fundamental purposes of the IAA nor does it shift the focus from adviser to client.

Gruss also claims that, like Section 10(b) of the Exchange Act, Section 206 of the IAA is "silent as to the extraterritorial application." Thus, based on the silence, *Morrison* would mandate the application of "the presumption against extraterritoriality." *Id.* at 2878. However, "[n]ot every silence is pregnant ... An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns v. U.S.,* 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) (quoting *Ill. Dep't of Public Aid v. Schweiker,* 707 F.2d 273, 277 (7th Cir. 1983)). Moreover, Section 929P(b) of the

Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, 124 Stat. 1376 (2010) ("Dodd–Frank Act"), which passed out of Conference Committee the day after the *Morrison* decision, may shed light on Congress' intent. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."). Entitled "Strengthening Enforcement by the Commission," Section 929P(b) amends the Securities Act, the Exchange Act, and the IAA to allow the SEC or the U.S. Justice Department to commence civil and criminal enforcement actions extraterritorially in certain cases.[4] Therefore, Section 929P(b) restores the SEC's extraterritorial authority over the IAA and its passage suggests that Congress intended for the extraterritorial application of the IAA during Gruss' alleged violations.

Taken together, this action is distinguishable from *Morrison* where the Court found that there was never an indication that the U.S. securities laws were designed to address securities sold on foreign exchanges. To bar the SEC, the government agency tasked with the job of regulating investment advisers from initiating an action against a domestic investment adviser because his actions defrauded a foreign investor would defeat the purposes of the IAA. Based on the conclusions set

---

**3.** As the Committee Reports indicate, Congress hoped to preserve "the personalized character of the services of investment advisers," and to eliminate conflicts of interest between the investment adviser and the clients as safeguards to both. *Capital Gains,* 375 U.S. at 191, 84 S.Ct. 275 (citing H.R.Rep. No. 2639, 76th Cong., 3d Sess. 26; S.Rep. No. 1775, 76th Cong., 3d Sess. 22).

**4.** Section 929P(b) amended the IAA to allow the SEC or the U.S. government to bring enforcement actions in instances where (i)

there is "conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transactions occurs outside the United States" or (ii) the "conduct occurring outside the United States that has a foreseeable substantial effect within the United States." In essence, Section 929P(b) may have restored the Second Circuit's "conduct and effects" test for actions brought by the SEC or the Department of Justice.

forth above, the motion to dismiss the complaint as impermissible under *Morrison* is denied.

## Morrison Even If Applicable Does Not Bar the SEC's Complaint

Alternatively, Gruss' argument fails even if his premise that *Morrison* applies is accepted. Gruss contends that the IAA does not have extraterritorial effect such that it can reach advice given to a fund in the Cayman Islands, because the statute does not punish deceptive conduct standing alone but only deceptive conduct on "any client or prospective client" in the U.S. *See* Brief of Defendant Gruss (Def. Br. at 17). According to Gruss, the Complaint "does not specify any harm to the Offshore Fund" or its clients but rather "it admits that 'DBZCO delivered consistent positive returns for its clients, accumulating forty-nine consecutive months of positive returns through October 2006.'" (Def. Br. at 13, citing Compl. ¶ 27).

Gruss, however, neglects the fact that more than half of the Offshore Fund's investors were located in the U.S., and that both the Offshore and Onshore Funds' investors were impacted by the alleged fraud. According to the Complaint, the inter-fund withdrawals violated all of the management agreements between DBZCO "and the funds under its management" (Compl. ¶ 46) and "[w]ithout the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints and might have been unable to fund its cash disbursements for its operating expenses." (*Id.* ¶ 45). Thus, the consistent positive returns Gruss cites to cannot be equated to a lack of harm to his clients.

Moreover, under *Morrison*, deceptive conduct is punished "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered" but transacted in the U.S. 130 S.Ct. at 2884. The Second Circuit recently addressed the second prong of *Morrison's* transactional test and clarified what constitutes a domestic transaction.[5] In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, the Second Circuit endorsed both an "irrevocable liability" and "transfer of title" standard, holding that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange ... a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." 677 F.3d 60, 68 (2d Cir.2012). Examples of factual allegations that would be sufficient include "facts concerning the formation of the contracts, the placements of purchase orders, the passing of title, or *the exchange of money* [.]" *Id.* at 70 (emphasis added). The clear concern for the court was where the location of the transactions occurred. *Id.* at 71–72 (granting plaintiffs leave to amend their complaint in order to plead additional factual allegations to support their claim that the transactions took place in the United States.).

Here, the Complaint alleges that the inter-fund transaction occurred domestically and not abroad. While in New York, Gruss allegedly instructed and approved the transfer of money from the Offshore Fund to the Onshore Fund. The transfers used to repay the revolving credit facility also involved money that was transferred from the U.S. bank account of the Offshore

---

**5.** The Offshore Fund's Offering Memoranda allowed the fund to make investments in U.S. securities that trade on domestic exchanges and over-the-counter and may implicate the first prong of *Morrison,* whether a transaction involves a security listed on a domestic exchange. Because neither party discussed whether such investments were made, the Court focuses on the second *Morrison* prong.

Fund to the U.S. bank account of the entity that provided the credit facility. Money to fund certain investments, many of which were U.S. companies, was also transferred from the U.S. bank account of the Offshore Fund directly to the U.S. bank account of the funded company. Similarly, Gruss approved the early withdrawal of management fees from client funds and the transfer of money to purchase the airplane in New York. Therefore, all of the alleged exchanges of money took place in the U.S., and not in the Cayman Islands.

In addition, the Complaint alleges other relevant facts that would have been dispositive under the conduct and effects test, which may have been revived with Section 929P(b) of the Dodd–Frank Act. Paragraphs 20–23 of the Complaint allege that: (1) all operational and investment decisions for the Offshore Fund were made by DBZCO primarily in DBZCO's New York office (Compl. ¶ 20); (2) the Offshore Fund agreed that DBZCO, in New York, would monitor the performance of the Offshore Fund, monitor compliance of the fund with all regulatory requirements, negotiate the terms of all agreements to be entered into on behalf of the fund and retain brokers and borrow money from certain banks on behalf of the Fund (*Id.*); (3) certain due diligence materials provided to prospective investors listed the full legal name and address of the Offshore Fund in care of DBZCO at DBZCO's New York address (*Id.* ¶ 21); (4) the offering and subscription documents for the Offshore Fund were distributed to potential investors by DBZCO from its New York office (*Id.*); (5) the accounting for the Offshore Fund's investment and other activities was performed primarily in New York, with data being provided to the third party administrator in the Cayman Islands, which distributed statements to individual investors (*Id.* ¶ 22); (6) monthly performance figures

were provided to individual investors from DBZCO's investor relations personnel in New York (*Id.*); and (7) all of the Offshore Fund's cash was held at and paid from U.S. bank and brokerage accounts. (*Id.* ¶ 23).

The Offering Memoranda and financial statements also demonstrate that (1) the securities of the Offshore Fund were marketed to permitted U.S. persons (Ex. C at v.); (2) the securities of the Offshore Fund were marketed to accredited investors and qualified purchasers, as defined by the U.S. securities laws (*Id.*); (3) the investment objectives of the Offshore Fund included investing in U.S. securities (*Id.* at 3); (4) the Offshore Fund would be paying certain U.S. taxes for dividend income and certain other interest from domestic investments (*Id.* at 15); (5) the auditors of the Offshore Fund were located in New York (*Id.* at 60); (6) investors wishing to subscribe in the Offshore Fund were instructed to wire funds to a Citibank account in New York (Ex. A. at Al1–1); and (7) shareholders in the Offshore Fund would receive quarterly unaudited financial information from DBZCO. (Ex. C. at 17).

Based on the foregoing facts and conclusions, this action is not precluded by *Morrison* even if applicable.

### C) *The Allegations in The Complaint Are Adequate*

Gruss offers a second ground for dismissal by arguing that the SEC allegations are insufficient to meet the pleading standards of particularity for aiding and abetting violations under Section 206(1) and 206(2) of the IAA. Taking the allegations in the Complaint as true, the requirements of Rules 8(a) and 9(b) have been met. *The Complaint Conforms to the Strictures of Rule 8(a)*

Gruss contends that the Complaint fails to conform to the requirements of Rule

8(a) because a claim cannot be plausible if the assertions directly contradict each other and if the facts outside of the complaint undermine the claim. (Def. Br. at 22–23, quoting *Nat'l Western Life Ins. Co. v. Merrill Lynch*, 175 F.Supp.2d 489, 492 (S.D.N.Y.2000)). To support his contention, he asserts that there are several material inconsistencies between the Complaint and the documents upon which it relies, the Offering Memoranda and the Audited Financial Statements, and that there are internal inconsistencies in the Complaint. (Def. Br. at 24). Specifically, he points out the Offering Memoranda disclosed that DB2C0 could enter into contracts and transactions on behalf of the fund without restrictions on the funds for investment use. (Def. Br. at 23).

> Notwithstanding the potential conflicts of interest resulting from these multiple relationships, the Manager [DB2C0] is expressly permitted to enter into contracts and transactions with its affiliates on behalf of the [Offshore] Fund.

(Ex. C at 52). Prior to the express permission to enter into transactions, however, the Offering Memoranda discusses the inherent conflicts of interest that may arise. (Ex. A at 29). Gruss contends that the Offering Memoranda disclosed that the interest of one client might be structurally subordinate to another. (Def. Br. at 23). However, the Offering Memoranda states that DB2C0 would not "knowingly or deliberately favor any other companies over the fund[.]" (Ex. C at 52). The Complaint alleges that DB2C0 and Gruss repeatedly favored the Onshore Fund to the detriment of the Offshore Fund when they transferred money from the Offshore Fund to the Onshore Fund, and allowed the Onshore Fund to make investments for the benefit of its shareholders as opposed to the shareholders of the Offshore Fund. (Compl. ¶ 26).

Gruss also argues, that contrary to the Complaint, there was no requirement that the contracts and transactions had to bear interest or that they had to be in the form of a loan. (Def. Br. at 23). Injury to the Offshore Fund, however, is a triable issue as it effectively loaned money to the Onshore Fund for long periods of time without receiving any interest and may have impacted the Offshore Fund's ability to claim that it was not engaged in a U.S. trade or business, which would be contrary to the stated purpose of the fund and could result in negative tax implications for the investors in the Offshore Fund. Even if the Onshore Fund ultimately repaid the Offshore Fund, as of the date that Gruss resigned when faced with termination, the Onshore Fund owed $108 million to the Offshore Fund. (Compl. ¶¶ 11, 44). Furthermore, the Offering Memoranda only contemplates two types of transactions, investments and loans that are assigned as determined by an independent investment manager. (Ex. A at 13, 29). The Complaint asserts that the inter-fund transfers did not fall into either category and therefore improper. (Compl. ¶ 26).

In addition, while the term "affiliates" is not defined in the Offering Memoranda for the Offshore Fund, other sections of the Offering Memoranda suggest that the term does not appear, as Gruss seems to suggest, to refer to the Onshore Fund. Another part of the conflicts section provides, "The manager, Mr. Zwirn and their respective affiliates, are actively engaged in advisory and management services. . . ." (Ex. C at 51). Likewise, the Offering Memoranda provides that "[o]ther accounts and funds may compete with the [Offshore] Fund for positions and may compensate the Manager and/or its affiliates better than the [Offshore] Fund." (*Id.*) DBZCO and its affiliates advised and managed several investment vehicles, including the Onshore Fund and the Offshore Fund,

and it does not appear that these investment vehicles themselves were "affiliates" of DBZCO.

Gruss makes additional arguments that the Complaint wrongfully alleges that there was commingling of funds between the Offshore Fund and Onshore Fund, whereas the Audited Financial Statements disclosed the respective payables and receivables were accounted for separately. (Def. Br. at 23). He argues that the amount of inter-fund transfers were disclosed to clients and properly accounted for in the Audited Financial Statements, and that the Complaint miscalculates the amount of inter-fund transfers outstanding in December 2005. *Id.* Gruss also suggests that the claim relating to the purchase of the airplane for DBZCO's managing partner is not properly pled because the Complaint does not allege that the fees owed to DBZCO were less than what was taken from the fund to pay for the airplane. (*Id.* at 3, n. 2).

The Complaint alleges that, while the financial statements for the Offshore Fund list the amount due from its affiliates, they do not document the full extent of the transfers. The financial statements never disclosed that the Offshore Fund transferred a much greater amount to the Onshore Fund during 2005 and that that money was repaid before the end of the year specifically in order to avoid inquiries from the auditors. (Compl. ¶ 35). Moreover, nowhere do the notes, which are described on every page of the financial statements as "an integral part of these consolidated financial statements," disclose that the transfers were being made in order to allow the Onshore Fund to repay its revolving credit facility or to make investments for its own behalf. As such, these disclosures do not meet the requirement of Section 206, which requires "full and frank disclosure." *Capital Gains*, 375

U.S. at 197, 201, 84 S.Ct. 275 ("what is required is 'a picture not simply of the show window, but of the entire store....' "). The Complaint also includes other alleged violations including that Gruss failed to "inform DBZCO's managing partner or any of the other DBZCO partners of the Inter-fund Transfer practice," (*Id.* ¶ 34), even after knowing that "all investment decisions were made by DBZCO's managing partner" (*Id.* ¶ 22).

The material inconsistencies pointed out by Gruss are not sufficiently persuasive to undermine the SEC's claims to the point of implausibility. In addition, Rule 8's liberal standard only requires that the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The SEC has alleged sufficient facts to raise their "right to relief above the speculative level to the plausible level." and to alert Gruss of the claims against him so that he may shape his defense. *Dallio*, 678 F.Supp.2d at 35.

*The Complaint Satisfies Rule 9(b)*

█ Gruss also argues that the SEC has failed to allege sufficient facts under Rule 9(b) to give rise to a strong inference of fraudulent intent. (Def. Br. at 24). Specifically, he maintains that he could not have had the requisite fraudulent intent because the transfers from the Offshore Fund to the Onshore Fund were expressly authorized by the offering documents and because the Complaint fails to specify if the early payment of management fees and the airplane payments exceeded the amounts due to DBZCO from the funds. (*Id.* at 25).

█ As an initial matter, the IAA "is not simply an anti-fraud measure like section 10(b). Unlike claims brought un-

der that section, claims of IAA violations do not require proof of intent or scienter" unless rooted in allegations of fraud. *Norman v. Salomon Smith Barney, Inc.*, 350 F.Supp.2d 382, 391 (2004), Claims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence. *See Capital Gains*, 375 U.S. at 200–01, 84 S.Ct. 275; *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir.2009) ("the government need not show intent to make out a section 206(2) violation"); *SEC v. Treadway*, 430 F.Supp.2d 293, 338 (S.D.N.Y.2006) ("Section 206(2) requires only negligence"). On the other hand, courts have found a requirement of scienter attendant to the establishment of a violation of Section 206(1) of the IAA. *See SEC v. Moran*, 922 F.Supp. at 896; *Carroll v. Bear, Stearns & Co.*, 416 F.Supp. 998, 1001 (D.C.N.Y.1976). "Allegations of scienter are sufficient if supported by facts giving rise to a 'strong inference' of fraudulent intent." *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir.1991). The requisite 'strong inference' may be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 139.

In this circuit, recklessness is a sufficiently culpable mental state for securities fraud. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir.2009). Recklessness is defined as "at the least, ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* Thus, even where motive is lacking, a plaintiff can make a showing of conscious misbehavior or recklessness through evidence

demonstrating that the defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* at 199 (internal quotation marks omitted).

Gruss maintains that the SEC failed to allege specific facts sufficient to demonstrate "that he acted recklessly to satisfy the requisite knowledge to be an aider or abettor." (Def. Br. at 24–25). The Complaint, however, need only plead facts that either gives rise to a strong inference of fraudulent intent or negligence by Gruss. "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court." *Gelles v. TDA Industries, Inc.*, No. 90–5133(MBM), 1991 WL 39673, at *6 (S.D.N.Y.1991). "The ... question is: Do the defendants know what the United States is claiming?" *SEC v. Gold*, No. 05–4713, 2006 WL 3462103, at *3 (E.D.N.Y. Aug. 18, 2006).

In addition, the SEC does not have to prove damages or injury to the advisory client in order to bring a suit under Section 206. In *Capital Gains*, the Supreme Court addressed the question of "whether Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit upon any client or prospective client,' [under Section 206 of the IAA] intended to require the Commission to establish fraud and deceit 'in their technical sense,' including intent to injure and actual injury to clients, or whether Congress intended a broad remedial construction of the Act which would encompass nondisclosure of material facts." 375 U.S. at 185–

86, 84 S.Ct. 275. After review of the legislative history, the Court held that Rule 206(2) did not require that the Commission prove intent to injure or actual injury to the client. *Id.* at 195, 84 S.Ct. 275; *see also SEC v. Wash. Inv. Network*, 475 F.3d 392, 396 (D.C.Cir.2007) (to obtain an injunction under Section 206 of the IAA, "the SEC does not need to prove reliance on the investment adviser's misleading statements, nor does the SEC need to prove injury"); *SEC v. Rana Research*, 8 F.3d 1358, 1363 (9th Cir.1993) ("The SEC need not prove injury in an action to enjoin violation of § 206 of the IAA.").

The Complaint has sufficiently alleged facts that give rise to a strong inference of fraudulent intent under both the motive and opportunity prong and the conscious misbehavior and recklessness prong. First, as the CFO of DBZCO, Gruss had every opportunity to commit fraud through his signatory and approval authority over all transfers of cash of any size. In fact, it was DBZCO's de facto policy that Gruss' express approval was necessary to transfer any amount. (Compl. ¶ 13). As for motive, the inter-fund transfers were used to offset the Onshore Fund's cash shortage and increase the fund's investment opportunities. (*Id.* ¶¶ 24, 25, 26). The Complaint also alleges that without the funds provided by the early withdrawal of management fees, DBZCO would have faced severe liquidity constraints. (*Id.* ¶ 45).

In addition, the Complaint alleges that Gruss' accounting subordinates repeatedly raised concerns that the transfers were inappropriate, threatened to quit over the practice, but that Gruss continued the practice. (*Id.* ¶¶ 31, 32). At the very least, Gruss had the duty to check whether the accountants' concerns were substantiated, especially when they asked Gruss to discuss the propriety of the matter with DBZCO's partners (Compl. ¶ 33). Such allegations are sufficiently strong to demonstrate a strong inference of recklessness, if not conscious misbehavior.

With respect to the allegations concerning the airplane purchase, the Complaint alleges that the money was returned to the Onshore Fund approximately two weeks after it was taken from the fund. (*Id.* ¶¶ 55–56). Gruss suggests that DBZCO was entitled to take such money because it represented owed fees; however, the SEC maintains that if this were the case, the money would not have been returned. *Id.* These facts suggest that Gruss benefitted in a concrete and personal way from the purported fraud and may have engaged in deliberately illegal behavior.

When taken together, the SEC's allegations are sufficient to support a conclusion that Gruss had the motive and opportunity to commit the fraud and to constitute strong circumstantial evidence of conscious misbehavior and recklessness. *See Kalnit*, 264 F.3d at 139. The SEC has pled sufficient facts with particularity to satisfy 9(b)'s pleading requirements and so that Gruss may defend the claims against him.

### Conclusion

Upon the conclusions set forth above, the motion of the Defendant to dismiss the Complaint pursuant to Rules 12(b)(6), 8(a) and 9(b) is denied.

It is so ordered.