NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0583n.06

Case No. 13-4021

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| MARK D. LAY, | ) | |
| | ) | **FILED** |
| Petitioner-Appellant, | ) | Aug 17, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| UNITED STATES OF AMERICA, | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| Respondent-Appellee. | ) | |
| | ) | |
| _____/ | ) | |

Before: **MERRITT and WHITE, Circuit Judges, and HOOD,**[*] **District Judge.**

**MERRITT, Circuit Judge.** This is an appeal from the denial of a motion to vacate a conviction and sentence filed pursuant to 28 U.S.C. § 2255. Defendant Mark Lay was convicted of fraud related to investments he made in a Bermuda hedge fund on behalf of the Ohio Bureau of Workers' Compensation. Defendant contends that the Supreme Court's opinion in *Morrison v. National Australia Bank, Ltd*., 561 U.S. 247 (2010), decided two years after he was convicted by a jury of fraud under Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6,[1]

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] The statute reads as follows:

**Prohibited transactions by investment advisers**

stripped the district court of jurisdiction and renders his underlying conviction unconstitutional. This appeal requires us to decide whether *Morrison's* limit on the extra-territorial scope of Section 10(b) of the Securities Exchange Act extends to criminal prosecutions brought in this case pursuant to the Investment Advisers Act. We conclude it does not.

In *Morrison*, the Supreme Court held that the protections of Section 10(b) of the Securities Exchange Act of 1934[2] apply primarily to domestic transactions, thereby limiting the scope of Section 10(b). *Morrison* involved a class action with (1) foreign plaintiffs suing (2) a

---

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
>
> (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; or
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6.

[2] Section 10(b) of the Act states as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

foreign issuer based on securities transaction in (3) foreign countries. In *Morrison*, a civil case, three Australian plaintiffs sued the National Australian Bank, an Australian bank, under Section 10(b) of the Securities Exchange Act of 1934, for losses they allegedly suffered on stock purchases traded on Australian exchanges. The Supreme Court held that a private right of action under Section 10(b) and Rule 10b–5 of the Exchange Act could be maintained by foreign plaintiffs only if (1) the security was listed on an American stock exchange or (2) the purchase or sale took place in the United States. 561 U.S. at 273. The Supreme Court framed the issue before it narrowly: "We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." *Id.* at 250-51. It held it did not. *Id.* at 265. The Court dismissed the complaint for failure to state a claim because the allegations involved no securities listed on a domestic exchange, and most, but not all, of the purchases occurred outside the United States. The Court reasoned that because the Exchange Act is silent on the extraterritorial reach of Section 10b, it must presume that Congress intended to limit its application to securities transactions occurring within the United States. *Id.* at 255. Prior to *Morrison*, if an alleged securities violation, whether occurring within or outside the United States borders, had an impact on investors or markets in the United States it was subject to federal securities law.

Defendant in this case focuses on the "silence" in the Investment Advisers Act regarding its extra-territorial reach to argue that, after *Morrison,* he could not be prosecuted for his principal role as an adviser in an investment company based in Bermuda. Defendant's argument fails because unlike the Securities Exchange Act, which focuses on the nature of the transaction, the Investment Advisers Act focuses solely on the conduct of the adviser.

**I.**

The facts supporting defendant's conviction for investor fraud are set out in detail in the Memorandum Opinion and Order issued by the district court after defendant's trial. *United States v. Lay*, 566 F. Supp. 2d 652 (N.D. Ohio 2008). To recount briefly, defendant was convicted of violations of the Investment Advisers Act, 15 U.S.C. § 80b-6, as well as three counts of wire and mail fraud. Defendant and the company he founded, MDL Capital Management, Inc., provided investment advice to the Ohio Bureau of Workers' Compensation. Defendant was at all relevant times the CEO, principal shareholder and Chief Investment Strategist of MDL Capital. MDL Capital was incorporated under the laws of the State of Pennsylvania and was, at all relevant times, registered with the Securities and Exchange Commission as an investment adviser under the Investment Advisers Act of 1940. As an investment adviser, MDL Capital provided investment adviser services for the purchase and selling of securities, to corporate, institutional and individual investors for compensation. The Ohio Bureau of Workers' Compensation is an Ohio agency, organized and existing under the laws of the State of Ohio. The Bureau assists Ohio-based employers and employees to cover expenses related to workplace injuries by providing medical and compensation benefits for work-related injuries, diseases and deaths. At the outset of the relationship, defendant and his company managed and invested the Bureau's workers' compensation monies in a United States-based fund, investing mainly in United States long-term treasury bonds. The fund made money for a number of years.

Defendant subsequently founded an "offshore" hedge fund, incorporated in Bermuda, and convinced the Bureau to invest in it as well. Defendant's company, MDL Capital, exercised general management and investment authority over the Bermuda fund. The corporate entity,

MDL Capital, was the Bermuda fund's investment adviser. Although defendant tried to recruit other investors, the Bureau was the sole investor in the Bermuda fund. Defendant and his company continued to manage investments from the Bureau in the two funds, one domestic and one based in Bermuda. Without the knowledge of the Bureau, defendant began to leverage the assets of the Bermuda fund in excess of the leverage limitation agreed to by the Bureau. Without knowledge of the overleveraging, the Bureau transferred substantial assets from the U.S.-based original fund to the Bermuda fund. The Bermuda fund incurred large losses, but defendant hid the losses from the Bureau. The Bermuda fund's board of directors realized that defendant had overleveraged the Bureau's assets in the Bermuda fund and requested permission from the Bureau to remove the leveraging limitations on the Bermuda fund. Now aware of the overleveraging in the Bermuda fund, the Bureau denied permission to remove the leverage limitation. Although admitting to some overleveraging, defendant continued to hide the extent of the overleveraging of the Bureau's assets in the Bermuda fund.

After an approximately $7 million decline in the value of the Bermuda fund, the Bureau met defendant to discuss the loss. During that meeting, defendant did not admit that he had far exceeded the leverage limitation. The Bureau later learned for the first time that the Bermuda fund had lost millions of dollars, which defendant had concealed up to that point. The Bureau then formally requested a redemption of its investment in the Bermuda fund, but it recovered only $9 million of a $225 million investment.

Defendant was convicted on all counts and sentenced to 60 months on the Investment Advisers Act count and concurrent sentences of 144 months on the three wire and mail fraud

charges.[3]   Our court affirmed, 612 F.3d 440 (6th Cir. 2010), and the Supreme Court denied certiorari, 562 U.S. 1264 (Feb. 28, 2011), *reh'g denied*, 131 S. Ct. 2481 (May 16, 2011).[4]

The district court denied defendant's § 2255 motion based on the factual record from trial, which demonstrated defendant had a fiduciary duty to the Bureau relating to the Bermuda fund.  The district court found this enough to satisfy the requirement in *Morrison* that the fraud was sufficiently domestic in nature to be prosecuted in the United States without analyzing the applicability of *Morrison* to the Investment Advisers Act.  *Lay v. United States*, No. 1:12 CV 1216, 2013 WL 4501045 (N.D. Ohio Aug. 21, 2013).  The district court granted a certificate of appealability as to the single issue of whether "the district court lacked jurisdiction with respect to the offenses for which the defendant . . . was convicted and sentenced."  Order, dated Aug. 30, 2013.  The district court later denied defendant's Expedited Motion for an Amended Certificate of Appealability in which defendant attempted to raise additional issues.[5]  Marginal Entry Order,

---

[3]Even if we were to vacate the conviction under the Investment Advisers Act, defendant would still be subject to the entire 144-month sentence for the other three convictions because the 60-month sentence for violation of the Investment Advisers Act runs concurrently with the 144-month sentence for the mail and wire fraud.

[4]The defendant filed the § 2255 motion on May 15, 2012.  The government moved to dismiss the motion as untimely because it was filed more than a year after denial of defendant's petition for certiorari on February 28, 2011.  The district court declined to deny defendant's § 2255 motion as untimely because it was filed within a year of the Supreme Court's denial of rehearing on May 16, 2011, and because defendant's then-counsel had been suspended from the practice of law during the relevant time period.  The government continues to contend on appeal that the motion should be dismissed as untimely.  Neither this court nor the Supreme Court has addressed the impact of the filing of a petition for rehearing on the one-year statute of limitations under 28 U.S.C. § 2255, so defendant correctly argues that there is no binding precedent in this circuit as to when the § 2255 motion is to be filed following a ruling by the United States Supreme Court.  Additionally, defendant argues that the rule of lenity should operate in his favor because his prior counsel was suspended from the right to practice law when the certiorari petition was denied.  The district court has the authority to equitably toll the one-year limitation period under § 2255 if (1) the petitioner has diligently pursued his rights, and (2) extraordinary circumstances exist.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  The district court below did not expressly rely on tolling, but instead relied on the lack of a dispositive Sixth Circuit opinion on the issue of when a judgment becomes final under § 2255, together with the fact that defendant's prior counsel was suspended during the relevant time frame.  Citing to the rule of lenity, the district court declined to deny defendant's § 2255 motion on the grounds that it was untimely filed.  Order, dated Aug. 16, 2012.  We find no error in the district court's factual findings or legal conclusions.

[5]Defendant raises two additional arguments on appeal that were not raised below and for which he did not obtain a certificate of appealability:  (1) whether his right against self-incrimination was violated during the jury trial and (2) whether the district court correctly calculated the amount of restitution.  Defendant concedes that his certificate of appealability did not include reference to these two additional issues, but argues we still have jurisdiction to address the issues. Reply Br. at 12-14.  We generally decline to address issues not certified for appeal, and, in addition, these arguments were not raised in the § 2255 motion filed in the district court so they are waived.

dated Feb. 28, 2014. We dismissed the appeal from the denial of the expedited motion. Order, No. 14-3218, dated Apr. 10, 2014.[6]

## II.

We review the denial of a 28 U.S.C. § 2255 motion *de novo* as to the legal issues and uphold factual findings of the district court unless they are clearly erroneous. *Hamblen v. United States*, 591 F.3d 471, 473 (6th Cir. 2009). To warrant relief under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)(citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

*Morrison* held that a private right of action under Section 10(b) and Rule 10b–5 of the Exchange Act could be maintained only if the security was listed on an American stock exchange or the purchase or sale took place in the United States. Defendant seeks to vacate his conviction on the ground that Section 206 of the Investment Advisers Act, by its terms, cannot be applied extraterritorially in light of *Morrison* because the fund was domiciled in Bermuda, making the Bermuda fund and, by extension, defendant himself, outside the reach of United States courts after *Morrison*. It is undisputed that the Bermuda-fund shares were not listed on a U.S. exchange. Defendant also argues that the shares in the Bermuda fund were not purchased or sold in the United States so therefore his transactions on behalf of the Bureau cannot be prosecuted under the Investment Advisers Act. The problem with defendant's argument is two-fold: (1) the Securities Exchange Act and the Investment Advisers Act seek to regulate different aspects of securities transactions, and (2) unlike *Morrison*, the only aspect of this case *not* tied to

---

[6] The appeal from denial of the expedited motion for an amended certificate of appealability was filed under a new docket number that has been consolidated with this case.

the United States is that the fund in question is based in Bermuda. All other aspects of the case are centered in the United States.

Defendant attempts to persuade us that his conduct regarding the relationship between the Bermuda fund and the Bureau was not sufficiently "domestic" to sustain the conviction pursuant to the Investment Advisers Act. The Investment Advisers Act regulates persons and entities in the business of advising others on securities investments, and requires such persons or entities to register with the Securities and Exchange Commission as investment advisers. Section 206 of the Investment Advisers Act is the source of federal fiduciary standards governing the conduct of investment advisers. Registered investment advisers, such as defendant and his company MDL Capital, have fiduciary obligations of good faith, loyalty, and fair dealing to the clients who entrust their money to the investment advisers. In contrast, the Securities Exchange Act, the statute at issue in *Morrison*, does not specifically prescribe a standard of conduct for investment advisers.

In an effort to turn the focus away from the wholly domestic nature of his relationship with the Ohio-based Bureau, including his fiduciary duty to it, defendant argues that his "client," for purposes of the Bermuda fund, and the entity to whom he owed a fiduciary duty, was the Bermuda fund itself, not the Bureau.[7] He takes this position because he did not have a separate investment adviser agreement with the Bureau regarding the Bermuda fund and his company, MDL Capital, was the investment adviser to its "client," the Bermuda fund. Therefore, he argues, he had no fiduciary duty to the Bureau regarding its investments in the Bermuda fund because it was not technically his "client" pursuant to an investment agreement. However, defendant did have an investment adviser agreement with the Bureau relating to the original

---

[7] This is a contrary position to the one defendant took in the civil suit brought against him by the Bureau where he maintained that his client was the Bureau. *Lay*, 566 F. Supp. 2d at 668 n.54.

domestic fund he also managed for it. Our previous opinion in this case on direct appeal specifically held that defendant had a fiduciary duty to the Bureau and that his "client" for the Bermuda fund was the Bureau, not the fund itself. *Lay*, 612 F.3d at 446. Given the course of dealing between the Bureau and defendant, as well as the adviser agreement signed by defendant relating to the original U.S.-based fund, we held that there was a single investment relationship between defendant and the Bureau encompassing both the domestic fund and the Bermuda fund. *Id.* Defendant's attempt to persuade us that his conduct was not sufficiently "domestic" to sustain the conviction pursuant to the Investment Advisers Act in light of *Morrison* is unavailing.

Even if the holding in *Morrison* were extended to the Investment Advisers Act, the facts of this case are readily distinguishable from those in *Morrison*. First, this is a criminal case brought by the United States government, not a civil case between two private parties like *Morrison*. Second, unlike *Morrison*, the plaintiff (United States) and defendant (Lay) are United States citizens. Third, in addition to managing the Bermuda fund, defendant also founded and managed a domestic investment fund that was part of the same investment program involving the Bermuda fund. Fourth, the victim in this case is an Ohio state agency holding money in trust for Ohio citizens, actual and corporate. Fifth, the fraudulent conduct took place primarily in the United States. Defendant sent fraudulent and misleading mail and wire communications (fax, telephone, email) between his office in Pittsburgh, Pennsylvania, and the Bureau's offices in Ohio. In fact, the only non-domestic component in this case is that the fund in question is domiciled in Bermuda.

Finally, no court has extended *Morrison's* "domestic" requirements to include the Investment Advisers Act. In *Morrison*, the Supreme Court based its interpretation of § 10(b) on the fact that "the focus of the Exchange Act is not upon the place where the deception originated,

but upon purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266. By contrast, "[a]s demonstrated by its text and regulatory structure, the focus of the [Investment Advisers Act] is clearly on the investment adviser and its actions." *SEC v. Gruss*, 859 F. Supp. 2d 653, 662 (S.D.N.Y. 2012). In delineating the differences between the Securities Exchange Act and the Investment Advisers Act, *Gruss* noted that: (1) the purpose of the Investment Advisers Act is to regulate and "to prevent fraudulent practices by investment advisers," (2) Section 206 is titled "Prohibited transactions by investment advisers," (3) the Investment Advisers Act does not allow a private cause of action, which demonstrates further that the focus is on the adviser and not the client, and (4) the legislative history of the Investment Advisers Act, as analyzed by the Supreme Court, shows that the legislation was designed to prevent fraudulent practices by investment advisers. *Id.* at 662-65 (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186-95 (1963)).

For the foregoing reasons, we affirm the judgment of the district court.